526 A.2d 334

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Dewitt CRAWLEY, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1986.

Decided May 27, 1987.

540

542

Michael Stack, Jr., Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Elizabeth Chambers, Philadelphia, Marion E. MacIntyre, Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

ZAPPALA, Justice.

This direct appeal arises from Appellant Dewitt Crawley's convictions of three counts of first degree murder arising from the deaths of his two teen-age nieces, Terri and Leslie Smith, and the girls' father, David Smith. Sentences of death were returned by the jury on each of the murder charges. Appellant was also found guilty of three counts of robbery, and one count each of rape and possession of instruments of crime. He was acquitted of a burglary charge. Following the denial of post-trial motions, consecu-

tive sentences of imprisonment of 10 to 20 years on each count of robbery and rape and of 2½ to 5 years on the weapons offense were imposed. We affirm the judgments of sentence.

The tragic events leading to the deaths of the three victims began when the Appellant was hired by his half-sister Kathleen Smith to perform carpentry work in her home. Kathleen Smith, the estranged wife of David Smith and the mother of Terri and Leslie, was fathered by the same man as was the Appellant, but did not have the same mother.

On December 19, 1983, the date on which the murders were committed, Mrs. Smith went to work, leaving her 18-year old daughter Terri at home. Terri did not attend school that day because she was ill. At approximately two p.m., Terri called her mother to tell her that the Appellant was at the house. When Mrs. Smith asked her why he was there, Terri said he had come to pick up his carpentry tools. Concerned that Appellant would be angry when he discovered he had been replaced by another carpenter hired to complete the work, Mrs. Smith asked Terri if he was mad. Terri only cried and was told by her mother to call again once he left. She called her mother shortly thereafter to say that he had gone and everything was fine.

After leaving work, Mrs. Smith stopped at the house of her mother, Mary Elizabeth Crawley, at 8:30 p.m. to hide Christmas presents which she had purchased for her daughters. Mrs. Crawley's house was located on the same block as the Smith residence. An half-hour later, the Appellant appeared at Mrs. Crawley's house to tell Mrs. Smith that he wanted to pick up his tools which were in her house. Surprised because Terri had said earlier that he had already done that, Mrs. Smith questioned him about that afternoon. He denied having retrieved his tools. He stated that he had first stopped at her house before coming to Mrs. Crawley's, but that no one had answered the door.

Despite his resistance and unexplained nervousness, Mrs. Smith decided to accompany him back to the house so he could collect his tools. She unlocked her front door, notic-

ing as she did that the door opened wider than usual. Movement of the door was ordinarily hampered by a sofa and table stored in the enclosed porch area. That night, however, the door swung back freely and the furniture appeared to be pushed back. They entered the house which was dark except for the light of the living room lamp. The tools had been placed on the floor.

After Appellant left, feeling no reason for concern, Mrs. Smith went back to her mother's house. She did not expect her daughter to be home because her mother had told her that Terri was planning on shopping with a girlfriend. Her mother had also said that she had sent Leslie, Mrs. Smith's 16–year old daughter, to the house to turn out a basement light earlier, but that she had not returned. Neither woman was alarmed by Leslie's failure to return because she had a girlfriend who lived in the area.

Mrs. Smith returned home at ten o'clock. Beginning to relax, she heard a faint voice, the source of which was a radio. She found the radio, which never left Terri's room, on top of the sofa stored on the enclosed porch. Her view of the radio was blocked by sheet rock which was positioned across the sofa, rather than propped against the sofa as it had been left. She began to notice many unusual things—a misplaced ceiling tile, clothes hung over the edge of steps leading upstairs, and a sewing machine moved to the hall-way floor. She went into Terri's room and saw that all of the dresser drawers were pulled out and clothes were strewn everywhere. Leslie's room was as it had been left, except that a bed looked as though it had been knocked down. She went next to her own room, but could not open the door because it was blocked by whatever was on the floor.

Thinking that light from her son's television radio would be useful, she went to her son's room. Unable to find the radio, she became scared at the thought that the house had been ransacked. After leaving his room, she tried to open the bathroom door. When the door would not open, she noticed it was smudged. What she did not know then was

that the smudge was blood. She went downstairs to call her mother, telling of her fears and requesting a flashlight because the lights were not working.

Her mother arrived with a flashlight and suggested that they check the switches in the basement. Using the flashlight, they went down the stairs in the basement. A lightbulb was loose in the socket and once it was turned, the light came on. They saw that sleeping bags and other camping equipment were pulled out. In the corner of the basement was a pile of things forming a semi-circle. Investigating further, they found a quilt belonging to one of the girls. Mrs. Smith reached down to pick the quilt up, but could not do it. She pushed other things away and pulled hard on the quilt. As the quilt came up, the body of one of her daughters was revealed.

The nude body could not be identified immediately as Terri because duct tape had been wrapped around her entire face, covering all but one eye. Mrs. Smith thought first that it was Leslie's body because she had been sent to the house to turn off the basement light. An electrical cord was wrapped around Terri's neck and hands, which were bound near her neck. Believing she heard Terri moan, Mrs. Smith turned the body towards her. Sadly, the moan was only imagined. Blood everywhere, she frantically tugged at the tape on Terri's face. Unable to remove the tape, she ran upstairs to get a knife. She gave it to her mother who cut the wire around Terri's hands. She left to call an ambulance once the tape was removed, seeking a neighbor's assistance as shock made her unable to dial the telephone.

In the meantime, Mrs. Crawley had contacted the police. Officers Louis Ricci and Ronald Byrne did not immediately enter the house when they responded to the call because a second radio call directed them to the neighbor's house from which Mrs. Smith's call was made. They accompanied her back to the house and directed her to remain in her living room. She began to realize that the dining room and kitchen were in complete disarray. Officer Byrne went to the basement. As he checked Terri's body for vital signs,

he noticed that rigor mortis had already started. He noticed bruises on her leg and a gaping wound in her cheek. Leaving the basement, he joined Officer Ricci on the second floor. What had blocked Mrs. Smith's entrance to the bathroom was the partially submerged dead body of her daughter Leslie. The tub was filled with bloody water. Leslie's legs, bound by electrical cord, hung over the side of the tub. Blood was found on the floor and door of the bathroom and in the hallway.

Officer Byrne proceeded downstairs. While on the enclosed porch, he saw for the first time David Smith's legs jutting out beneath the sofa. Byrne uncovered the body. Protruding from the back of Smith's head were scissors and an awl which had been deeply embedded. A nail had been driven into his mouth. Mrs. Crawley was unable to identify the body even after the officer turned Smith's face towards them. Byrne noticed also that several ceiling tiles appeared to be missing, and that the tile appeared to be smeared with blood as though someone had tried to wipe it away.

Dr. Halbert Fillinger, the forensic pathologist on duty that evening, was called to the crime scene. He observed that a grooved pattern was marked around Terri Smith's neck. The pattern corresponded to the type of injury which results when a ligature or line has been placed around the neck and pressure has been applied. Directly above the area where the body lay, he noticed a nail in the rafter which was bent downward. The postmortem examination which was subsequently conducted by Dr. Fillinger disclosed bruising and tearing of the scalp due to multiple blunt impacts, facial stabs wounds and bruises, strangulation, and vaginal tearing. The cause of death was multiple injuries of the head and neck. His medical opinion was that Terri Smith was alive when the ligature was placed around her neck and hung from the rafters.

In addition to the visual observations made by the police officer, Dr. Fillinger's examination of David Smith's body disclosed in excess of 13 blunt impacts to the head, as well as extensive tearing and shattering of the skull, and stab

wounds of the neck and back cutting into the muscles. The position of the injuries indicated that Mr. Smith had been attacked from behind. The cause of death was multiple injuries of the head, neck, and trunk. Leslie Smith's death resulted from multiple head injuries and drowning. She sustained blunt impacts to and lacerations of the head, as well as skull and jaw fractures.

At trial, the testimony of Angela Davis, Jerry Noville, and Jessie Lee Brown, III placed the Appellant inside of the Smith's residence between 5:00 and 7:00 p.m., several hours after Terri Smith had reassured her mother that he had left the house without incident. Mrs. Davis and Mr. Noville were neighbors of the Smith family at the time of the murders. The most damning testimony was elicited from Mr. Brown, who was working that day at his employer's home in the neighborhood. Mr. Brown knew Terri, who had introduced him to the Appellant. At approximately 5:00 p.m. he saw the Appellant walking on the street carrying what appeared to be a piece of metal and noticed that the Appellant was admitted into the Smith house. As he passed the house shortly thereafter, Mr. Brown heard an argument. He identified the voices as those of a man and a woman. Mr. Brown observed that Terri Smith walked into the front room of the house, followed by the Appellant. He then saw the Appellant strike the leftside of Terri's head with a pipe. Reluctant to become involved, Mr. Brown made no efforts to intervene on Terri's behalf. He testified that he felt relieved when David Smith arrived about five minutes later, parked his car, and went to the house. Presaging what he would soon learn about this chance encounter, Mr. Brown did not see David Smith again that day, but later observed the Appellant driving Smith's car. David Smith had never allowed anyone to drive his car.

Angela Davis testified that she saw the Appellant at the house for the first time that day between 1:00 or 2:00 p.m. as she walked past the house. She saw him later that day after 5:00 p.m. at which time she observed him on the porch, poking the ceiling with a stick. He then entered the house.

Similarly, Jerry Noville testified that he saw the Appellant in the house during the course of several hours and also had seen him poking at the porch ceiling. He testified further that he had seen Leslie Smith coming from her grandmother's home and that the Appellant was still at the house at that time.

In his capacity as a forensic serologist, Special Agent William McInnis of the Federal Bureau of Investigation examined clothing of the victims and that which the Appellant was wearing when he was arrested. Each of the victims had blood typed as group B; the Appellant's blood was typed as group A. Typed blood from the jacket and pants of Leslie Smith indicated the presence of the A blood group. Although the presence of the A blood group eliminated each of the victims as the source of blood found on the garments, the blood could not be identified conclusively as that of the Appellant. The Commonwealth also introduced evidence that an inventory subsequently conducted by Mrs. Smith revealed that coin sets, a collection of pennies, and spending money which she had given her daughters on the morning of their deaths were missing.

The defense consisted of the testimony of two witnesses, Julia Postle, a neighbor of the Smiths who was called to contradict statements made by Mr. Brown, and Mr. Brown himself. Their testimony had a negligible impact on the prosecution's case.

■ The jury found the Appellant guilty of each of the crimes charged with the exception of the burglary count. For each of the homicides, the jury returned the death penalty based upon its finding of five aggravating circumstances and no mitigating circumstances.[1] The aggravating

1. During the sentencing hearing, defense counsel strenuously argued against the Commonwealth's evidence of aggravating circumstances. No evidence of mitigating circumstances was introduced, however. Because of the finality of a death sentence and the potential for a claim of ineffective assistance of counsel in subsequent P.C.H.A. proceedings under such circumstances, we direct that henceforth a trial judge conduct an in-chambers colloquy with the Defendant in the presence of counsel to determine that the Defendant himself has

circumstances found by the jury were: (1) the victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses; (2) the defendant committed a killing while in the perpetration of a felony; (3) the offense was committed by means of torture; (4) the defendant has a significant history of felony convictions involving the use or threat of violence to the person; and (5) the defendant has been convicted of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable. 42 Pa.C.S. § 9711(d)(5), (6), (8), (9), (10).

## I. SUFFICIENCY OF THE EVIDENCE

■ The Appellant does not raise the issue of the sufficiency of the evidence; however, we stated in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), reh. den., 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983) that an independent review of the record would be conducted to determine the sufficiency of the evidence in capital punishment cases. Circumstantial evidence suffices to prove any element or all the elements of the crime of homicide. *Commonwealth v. Glass*, 486 Pa. 334, 405 A.2d 1236 (1979) (plurality opinion); *Commonwealth v. Amato*, 449 Pa. 592, 297 A.2d 462 (1972). Upon examination of the record, viewing the evidence and all reasonable inferences arising therefrom in the light most favorable to the Com-

chosen not to submit evidence of mitigation and that he is aware that the verdict must be a sentence of death if the jury finds at least one aggravating circumstance and no mitigating circumstances. While a trial court's failure to conduct such a colloquy will not preclude such an inquiry if a claim of ineffectiveness is raised later in a P.C.H.A. proceeding, such a colloquy will serve to insure the integrity of a sentence of death if a defendant and his counsel are or are not in agreement on the advisability of introducing evidence of mitigating circumstances. We caution, however, that ineffectiveness of counsel will not be presumed simply because no mitigating evidence was introduced.

monwealth, we find that the evidence establishes beyond a reasonable doubt that the killings committed by the Appellant were willful, deliberate, and premeditated.

## II.  ALLEGATIONS OF TRIAL ERROR

■ The Appellant contends that the trial court erred in admitting into evidence sketches, body charts, mannequins representing the victim's heads, and photographs.  The admission into evidence of such exhibits lies within the sound discretion of the trial judge.  The sketches depicted the positions of the bodies when they were discovered. Defense counsel objected to the admission of the sketches on the basis that the witnesses' testimony was adequate to describe the position of the bodies.  The sketches, which were neutral and in no way inflammatory, were properly admitted into evidence as a visual aid to assist the jury.

■ Nor did the trial court err in admitting into evidence the body charts of the victims or the mannequins. The body charts, which had been prepared by a detective present when the post-mortem examinations were conducted, were outlined figures marked with "X's" at the location of the wounds inflicted on each of the victims.  The Appellant's claim of error is baseless as it is difficult to imagine a more dispassionate presentation of the repeated blows which the victims sustained.  Given the number of victims and the similarity of their wounds, the charts provided the jury with an objective display which would avoid confusion. Similarly, the mannequins, which were used to mark the location of the fatal head injuries, were objectively utilized to assist Dr. Fillinger during his testimony.

■ The Appellant next argues that the admission into evidence of black and white photographs of the location and scene of the crime and of the bodies of two of the victims was inflammatory and prejudicial.  As we stated in *Commonwealth v. Garcia*, 505 Pa. 304, 479 A.2d 473 (1984), a photograph that is not judged inflammatory is admissible if it is relevant and assists the jury in understanding the facts, but a gruesome or potentially inflammatory photo-

graph is admissible only if the need for the evidence clearly outweighs the likelihood of inflaming the minds and passions of the jurors. The visibility of blood in a photograph does not necessarily require a finding that the photograph is inflammatory. We have examined the photographs of the crime scene and conclude that the photographs are not inflammatory. As in *Garcia*, the photographs were properly admitted to aid the jury in reconstructing the factual circumstances surrounding the three murders.

■ We conclude also that the photograph of David Smith, which showed his body lying face down on the porch, was not inflammatory. No wound or blood on the victim is visible in the photograph and the plywood which covered his head concealed the awl and scissors. The Commonwealth introduced the photograph subsequent to defense counsel's cross-examination of Mrs. Crawley as to the positioning of his body when it was discovered on the porch. The photograph was properly admitted for this purpose as it was relevant to show the location of the body.

■ The photographs of Leslie Smith, which show her body partially submerged in the bloodied water in the bathtub, require additional consideration because of their potentially inflammatory nature. The Commonwealth offered the photographs into evidence following defense counsel's cross-examination of Officer Byrne as to the amount of water which was in the bathtub and the position of the body when it was found. The line of inquiry was clearly intended to suggest that there was not sufficient water in the bathtub for Leslie Smith to have drowned. Despite their potentially inflammatory character, the photographs were properly admitted to rebut this challenge to the accuracy of the officer's description and to support the Commonwealth's position that drowning was one of the causes of the girl's death.[2]

2. We note also that the trial judge instructed the jurors that the photographs were being introduced for explanatory purposes and that they should not permit themselves to be emotionally swayed by the photographs.

■ Appellant further asserts that the trial court abused its discretion when it failed to grant a mistrial after permitting the prosecution to play a recording of the telephone call made by Mrs. Crawley to the police after discovering the body of her granddaughter. After Mrs. Crawley testified that she had called the police, the prosecutor requested that a police officer play a portion of the recorded call to the jury. Defense counsel requested a side bar conference which was held off the record. No objection to the recording was made prior to the playing of the tape. After the tape was played, a second side bar conference was held on the record. At that time defense counsel moved for a mistrial, stating that the screaming of the distraught caller was inflammatory and had little probative value. The motion for a mistrial was denied. Mrs. Crawley then identified the voice on the tape as her own.

The grant of a mistrial is within the sound discretion of the trial judge. *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985). "A mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive appellant of a fair trial." *Commonwealth v. Hernandez*, 498 Pa. 405, 415, 446 A.2d 1268, 1273 (1982), citing *Commonwealth v. Brown*, 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975); *Commonwealth v. Simon*, 432 Pa. 386, 248 A.2d 289 (1968). The Commonwealth argues that the evidence was relevant to avert potential confusion which might arise from other testimony in the Commonwealth's case. This questionable possibility of confusion raised by the Commonwealth refers to subsequent testimony of the police officer who responded to the call made by Mrs. Smith from a neighbor's house. No confusion existed when the recording was played. The Commonwealth spuriously suggests that the tape was introduced to show that the officer's failure to go directly to the Smith house was due to an error in the police transmission of the incoming call. As the testimony developed, this fact was of no relevance to the prosecution's case.

The Commonwealth's anticipation of confusion does not justify the introduction of the tape recording. The recording was potentially inflammatory and unnecessary because the witness who made the call was in fact testifying as to the events. On the record before us, however, we conclude that the introduction of the evidence did not have the unavoidable effect of depriving the Appellant of a fair trial.[3]

The Appellant contends the trial court abused its discretion in denying a motion for mistrial after a police officer testified that Mrs. Crawley had accused the Appellant of being the killer. Her accusation was apparently based upon her observation of the Appellant's unusual and suspicious behavior after the murders had been committed. The statement was made to Officer McGrath, who transported Mrs. Crawley, Mrs. Smith, and the Appellant to the police station. The Appellant, who was escorted as a courtesy to the family members, was not a suspect at that time. As the Appellant approached the police car, Mrs. Crawley stated to the officer, "There's your killer." Since defense counsel's previous objection to the testimony had been overruled, a motion for a mistrial was made and denied. Officer McGrath further testified that when Mrs. Crawley began to question the Appellant about the day's events, the Appellant appeared apprehensive and was unable to face the two women.

Mrs. Crawley's suspicions that the Appellant was involved in the murders were strengthened by her observations that he had recently showered and doused himself with talcum powder and that he was ill-at-ease. The inquisitorial character of Mrs. Crawley's questioning of Appellant was relevant to demonstrate to the jury that her interest in his whereabouts that day did not arise out of the casual interest of a family member, but from her conviction that he was responsible for the murders. The accusation which she made to the police officer provided a framework from

---

**3.** This is not to be construed as condonation of such action, and we caution prosecutors against succumbing to the temptation to overtry a case by introducing evidence which is merely cumulative of that proffered through a witness' testimony.

which the jury could interpret the evasive response of the Appellant. We conclude, therefore, that the trial judge did not abuse her discretion in denying the motion for a mistrial.[4]

■ Appellant next asserts that testimony of his brother, Milton Crawley, was improperly admitted. Milton Crawley briefly testified that he had hired the Appellant to do work inside his home; that the work was not completed; that someone else then completed the work; and the Appellant became very angry and threatened him after discovering the work had been completed.

Evidence of other unrelated criminal conduct of an accused is generally inadmissible to prove the commission of a crime for which he is being tried. *Commonwealth v. Styles*, 494 Pa. 524, 431 A.2d 978 (1981). As we stated, however, in *Commonwealth v. Travaglia*, 502 Pa. 474, 492, 467 A.2d 288, 297 (1983),

It is equally clear, however, that evidence of other crimes is admissible where it is relevant to prove (1) motive, (2) intent, (3) a common scheme or plan involving the commission of two or more crimes so closely related that proof of one tends to prove the other, (4) the identity of the accused as the perpetrator, or (5) the absence of mistake or accident. [Citation omitted.]

Shortly before the murders, when the work was partially done, Kathleen Smith had hired another carpenter to replace the Appellant. Milton Crawley's testimony, which was relevant to establish the motive behind what might otherwise appear to be the inexplicable brutal conduct of the Appellant directed against his relatives, was properly admitted.[5]

---

**4.** The Appellant's additional claim that the prosecutor withheld the challenged remark during a suppression hearing is unsupported by the record. Officer McGrath had testified about the remark at the suppression hearing. [N.T. December 11, 1984, pp. 79–81].

**5.** Appellant's claim that Milton Crawley's statement to the prosecution was withheld from defense counsel is meritless. Milton Crawley's statement was taken on December 7, 1984—only ten days before trial. The prosecutor provided defense counsel with a copy when voir dire

The Appellant alleges the trial court erred in refusing to grant him a continuation for one month as requested to review the F.B.I.'s chemical report regarding blood samples and stains and semen stains and that the prosecutor improperly withheld the report for six months. During a pre-trial conference on March 29, 1984, the Commonwealth indicated that a copy of the F.B.I.'s report would be furnished to defense counsel when it was received. The report, dated June 27, 1984, was given to defense counsel at the suppression hearing held on December 11, 1984. Because the record does not indicate when the report was forwarded to the prosecutor, we will not speculate as to the date on which it was received by the Commonwealth.[6]

■■■ We also reject Appellant's contention that the trial court erred in refusing to grant a continuance. The Commonwealth had offered to make Dr. Fillinger, Dr. Tumosa— head of the police chemical laboratory, and an F.B.I. chemist available to assist defense counsel. More importantly, however, the trial judge indicated that defense counsel would be permitted to retain an independent expert to aid him and that an order would be entered directing payment of the expert. [N.T. December 12, 1984, p. 205]. Defense counsel was provided sufficient opportunity to conduct the necessary review of the chemical examination and the Appellant's claim of prejudice is unfounded.[7]

was conducted on December 13, 1984. [N.T. December 13, 1984, p. V–189].

6. The Commonwealth states in its brief that the report was not received until Special Agent McInnis appeared to testify at the Appellant's trial. To support this statement, the Commonwealth refers to representations made to the trial court by the prosecutor during argument on post-trial motions. [N.T. December 11, 1984, p. 20]. This is not a matter of record, however, which this Court may consider in resolution of the issue.

7. Appellant tangentially raises allegations of prosecutorial misconduct related to his argument that the documentary evidence and tape recording were improperly admitted and that counsel was not promptly provided with the F.B.I. report. Having determined that his arguments on these issues are meritless, there is no basis for finding prosecutorial misconduct.

■ An allegation of prosecutorial misconduct has been made by the Appellant in reference to statements made during closing argument which it is argued impermissibly commented upon the Appellant's failure to testify. A prosecutor is not permitted to comment adversely upon a defendant's refusal to testify on the merits of the charge against him. "The rationale for this rule is that such comment would run counter to the privilege against self-incrimination and the defendant's presumption of innocence." *Commonwealth v. Travaglia*, 502 Pa. at 498, 467 A.2d at 300 (1983). The protections afforded to a defendant by this privilege must be zealously guarded to insure that a verdict of guilt is founded solely upon the evidence presented.

Having reviewed the closing arguments of both the prosecutor and defense counsel in their entirety, we conclude that the prosecutor's statements did not reflect adversely upon the Appellant's decision to not testify. When read in context the rhetorical inquiries seemingly posed by the prosecutor to the Appellant do not offend the privilege against self-incrimination or the presumption of innocence. The statements were simply the declamation of the prosecutor that the evidence, albeit circumstantial, lead unerringly to but one conclusion—that the Appellant had committed the three murders. [N.T. December 20, 1984, pp. 817–845].

### III. SENTENCING PHASE

■ The three remaining issues raised by the Appellant involve the sentencing phase of the trial. Appellant first contends that the death qualification of the jury was improper and deprived him of a fair trial. We have held that death qualification does not deprive the defendant of a fair determination of guilt or innocence. *Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984). This argument has been rejected as well by the United States Supreme Court. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

■ The Appellant next asserts that it was prosecutorial misconduct for the prosecutor to argue during closing state-

ments at the sentencing hearing that the jury should impose the death penalty as a message to a judge who had previously sentenced the Appellant following his 1971 guilty plea for second degree murder. We agree.

The prosecutor stated the following in his closing argument:

> Ladies and gentlemen, isn't it ironic and, yes, sad that some judge listening at how a sixteen year old was brutally stabbed sixteen times all he could come up with in his mind was that there was just an intention to hurt him; there was not an intention to kill him. Therefore, it is less of a crime to kill a sixteen year old negro male in West Philadelphia than it would be his counterpart in another part of the city. That's what that judge said. Let's give Mr. Crawley that body. Let's say that there was mercy shown by that judge; there was compassion. And I hope you—I know I will—send this judge a message that had you done your job back in 1971 David Smith would be here today, Terri Smith would be here today, Leslie Smith would be here today.

[N.T. December 21, 1984, pp. 932–933]. Defense counsel objected to the prosecutor's remarks and moved for a mistrial at a side bar conference.

It is extremely prejudicial for a prosecutor to exhort a jury to return a death sentence as a message to the judicial system or its officers. The jury's determination must be based solely upon the evidence of aggravating and mitigating circumstances, not upon an emotional appeal or crusading incitation to make a statement in response to what is portrayed as a failing judicial system. While such remarks will ordinarily necessitate that the death penalty be reduced to life imprisonment, we sustain the death penalty in this case for the following reasons. Of the five aggravating circumstances submitted by the Commonwealth and found by the jury, we find that the jury properly found that the Appellant committed a killing while in the perpetration of a felony and that he had been convicted of an offense before or at the time of the offense at issue, for which a sentence

of life imprisonment or death was imposable.[8]  No mitigating circumstances were found by the jury.  The jury was required therefore to return a sentence of death.  42 Pa. C.S. § 9711(c)(1)(iv).  Because the two aggravating circumstances properly found by the jury are neutral in character, as contrasted with other aggravating circumstances which interject a subjective element into the jury's consideration, there was no weighing process which could have been adversely affected by the prosecutor's improper comments. Therefore, the improper comments were not controlling.

Finally, the Appellant asserts that the jury's finding of each of the five aggravating circumstances was not supported by the evidence.  The jury found that a victim was a prosecution witness to a murder or other felony and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses, 42 Pa.C.S. § 9711(d)(5).  The Appellant argues that there is no evidence to support this finding and that the Commonwealth failed to establish this circumstance beyond a reasonable doubt.  We conclude that on this record it is clear that there is insufficient evidence to establish the necessary elements of the aggravating circumstance.

In *Commonwealth v. Zettlemoyer, supra,* we found that the Commonwealth's evidence that the victim had worked with the defendant at a retail store and had been scheduled to appear as a Commonwealth witness against the defendant in a pending criminal proceeding was sufficient to establish the aggravating circumstance set forth in 42 Pa. C.S. § 9711(d)(5) beyond a reasonable doubt.  The evidence had also shown that during the jury selection portion of those criminal proceedings, the Commonwealth had stated in the defendant's presence that the prosecution intended to call the victim as a witness.  Concluding that the language of the subsection was unambiguous, we rejected the defend-

---

8.  As discussed fully herein, infra, we conclude that the jury's findings of the three other aggravating circumstances are invalid.

ant's argument in *Zettlemoyer* that § 9711(d)(5) should be limited to the killing of an eyewitness only, as opposed to a witness who was not present at the scene of the collateral murder or felony.

The Commonwealth now argues in favor of an interpretation of the language of § 9711(d)(5) which would expand its application not only to a prosecution witness, but to *any* witness to a murder or felony. This analysis is inconsistent with the precise language of the subsection. The legislature clearly intended that the Commonwealth bear the burden of establishing (1) that the victim was a prosecution witness to a murder or other felony, and (2) that the victim was killed for the purpose of preventing the testimony in a grand jury or criminal proceeding involving the offense.

We hold that under § 9711(d)(5), evidence must be introduced to prove that the victim was a prosecution witness who was killed to prevent his testimony in a pending grand jury or criminal proceeding. The burden of the Commonwealth will not be met by simply showing that an individual who witnessed a murder or other felony committed by a defendant was also killed by the defendant. To hold otherwise would distort the language we found expressed "... the obvious intention of the drafters who quite clearly were concerned with the type of frontal assault upon the criminal justice system of this Commonwealth" as was demonstrated in *Zettlemoyer*, 500 Pa. at 44, 454 A.2d at 952.

The "frontal assault" of which we spoke was clearly not that of multiple murders as the Commonwealth would have us hold. We reject the Commonwealth's argument, the weakness of which is demonstrated by the confusion evidenced by the jury in the instant case. After some deliberations, the jury returned with the following question:

THE FOREMAN: Your Honor, question number 1: "Was Leslie Smith a witness for the prosecution, or would she be a witness for the prosecution, or could she

be presumed a witness for the prosecution, and does it make a difference?"

[N.T. December 21, 1984, p. 944]. The question posed by the jury highlights the difficulties inherent in the interpretation urged by the Commonwealth. The jurors in the instant case were permitted to speculate whether any of the victims was a prosecution witness killed to prevent testimony against the Appellant.[9]

■■■ The jury also found the aggravating circumstance that the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8). The Appellant asserts, and we agree, that the trial court improperly permitted Dr. Fillinger to define the term "torture" to the jury and to give his expert opinion that the murders were committed by means of torture. On direct examination, Dr. Fillinger testified as follows:

Q. And finally, doctor, based on your view of the area beneath the ligature tract, can you render an opinion as to whether or not Terri Smith was alive at the point at which the ligature was placed around her neck and, in your opinion, over the rafters?

A. Yes. It is my opinion she was alive when that was placed there.

Q. And finally, doctor, realizing the ambiguity inherent in the term torture, looking at the number of injuries, the extent of the injuries, and to your knowledge of the effect of the number of injuries to the portions of the three bodies, in your opinion is there an element of torture involving all three of the victims?

9. The trial judge did not elucidate on the question raised by the jury. Instead, she reiterated her charge that it was the jury's duty to determine whether there were aggravating or mitigating circumstances and stated that the question could not be answered for that reason. This response was inadequate and did not provide any guidance to the jury. At a minimum, the jury should have been reapprised that the Commonwealth bears the burden of establishing the aggravating circumstances beyond a reasonable doubt and instructed that there are no presumptions in favor of the Commonwealth.

A. Yes. If I understand the definition of the word torture, one of the definitions is the production of pain.

And there is no question that all three of these victims suffered multiple injuries which would have produced pain, conscious pain, before death. And that to me would supply the element of the definition of the word torture.

[N.T. December 20, 1984, pp. 772-773]. No objection was made by defense counsel to this line of questioning. Further testimony relating to torture was elicited during cross-examination of the witness:

BY MR. STACK:

Q. Doctor, picking up on your last answer—

A. Yes.

Q. —you would say then that in every case of death where there was an injury that you could, if you wanted to, find that as torture if there was pain?

A. I think you have to include that—the suffix to your comment, counselor, that there has to be conscious pain. That has the element of the definition.

Q. But any person that is conscious at the time they receive any kind of an injury are you saying that is torture—

MR. KING: Objection.

THE COURT: Overruled.

BY MR. STACK:

Q. —if they experience pain?

A. I'm saying that any person who sustains an injury that causes pain that fits the definition of torture that I know of. I don't know what definition may be applied by the courts. That's the one that I apply.

[N.T. December 20, 1984, pp. 774-775].

During the sentencing hearing, the prosecutor requested that the testimony of Dr. Fillinger relating to his expert opinion that each of the victims died as a result of torture be incorporated as part of the evidence. Defense counsel's general objection to the offer made by the prosecutor was

overruled. The trial judge did not instruct the jury on the issue of torture, failing even to charge the jury as to a definition of torture. The jury was left then only with the definition of torture as "the production of pain", which was supplied by Dr. Fillinger, and his medical testimony that each of the victims was tortured. The responsibility for providing a legal definition of torture to be applied by the jury rests solely with the trial judge. Although the remaining evidence, excluding that of Dr. Fillinger's opinion, would have been sufficient to support a finding that the murders were committed by means of torture, we cannot sustain the jury's finding of torture because it was premised on an improper definition of torture.

In order to establish that the offense was committed by means of torture, the Commonwealth must prove that the defendant had a specific intent to inflict pain, suffering, or pain and suffering in addition to the specific intent to kill. *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987); *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689 (1986); *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). The absence of any such instruction was prejudicially deficient.

The Appellant next contends that the evidence does not support a finding that he had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9). Because the only evidence upon which the jury's finding was based was the Appellant's prior conviction of one murder in 1971, we must agree. *Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985).[10]

10. The legislature subsequently amended the death penalty statute, adding as aggravating circumstances that the defendant has been convicted of another murder, committed either before or at the time of the offense at issue or that the defendant has been convicted of voluntary manslaughter as defined in 18 Pa.C.S. § 2503, committed either before or at the time of the offense at issue. Act No. 1986–87, 42 Pa.C.S. § 9711(d)(11), (12).

As to the Appellant's final contentions that there was insufficient evidence to sustain a finding that the killing was committed in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and that he had been convicted of another offense, committed before or at the time of the offense in issue, for which a sentence of life imprisonment or death was imposable, 42 Pa.C.S. § 9711(d)(10), we find the Appellant's claims to be meritless and sustain the jury's findings of those aggravating circumstances. Because the jury found no mitigating circumstances and two of the five aggravating circumstances have been upheld, we sustain the convictions and affirm the sentence of death. After review of the statistical information compiled by the Administrative Office of Pennsylvania Courts, we have determined that the sentence of death was not disproportionate to the penalty imposed in similar cases. 42 Pa.C.S. § 9711(h)(3)(iii).

LARSEN, J., filed a concurring opinion in which PAPADAKOS and McDERMOTT, JJ., joined.

LARSEN, Justice, concurring.

I join in the affirmance of appellant's convictions and his judgments of sentence of death. I write separately for two reasons.

First, I write to make explicit what the majority opinion today implicitly holds. The majority determines that the prosecutor's improper and prejudicial closing comments, exhorting the jury to sentence appellant to death in order to send a message to the judiciary, do not necessitate the vacation of appellant's judgments of sentence of death. This ruling implicitly recognizes that the General Assembly has expressly directed this Court to affirm a sentence of death unless we determine that such improper commentary or some "passion, prejudice or any other arbitrary factor" has *produced the sentence of death*. The Sentencing Code provides:

> In addition to its authority to correct errors at trial ... the Supreme Court shall affirm the sentence of death unless it determines that:
>
> (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
>
> (ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or
>
> (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S.A. § 9711(h)(2) and (3).

Because Mr. Crawley's sentences of death were fully supported and required by the evidence of the horrifying intentional killings, several aggravating circumstances and no mitigating circumstances, and were not produced by the prosecutor's improper comments, this Court is required by statute to affirm his judgments of sentence of death. *See Commonwealth v. Whitney,* 511 Pa. 232, 512 A.2d 1152 (1986) *and Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

My second reason for writing separately is because of my disagreement with the majority's determination regarding the aggravating circumstance of committing the killings "by means of torture." 42 Pa.C.S.A. § 9711(d)(8). As in the case of the prosecutor's improper closing remarks during the sentencing hearing, I do not believe that the court's error in permitting Dr. Fillinger to give his opinion that the killing of Leslie Smith was committed by torture, *produced* the jury's finding that the Commonwealth had proven that aggravating circumstance; nor do I believe that the Court's failure to give a more comprehensive definition of "torture" is fatal to the jury's finding that the killings had been committed by means of torture. As I stated recently in *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728 (1987):

*By anybody's definition,* appellant tortured his victim, and committed the offense of murder of the first degree by means of torture.

\* \* \* \* \* \*

Perhaps in the abstract, or in another case, the evidence would not support the aggravating circumstance of "torture" where the trial court gave no elaboration on the meaning of that term to the jury and the jury was permitted to find such aggravating circumstance on sparse or speculative evidence of "torture." This is not such a case, however. It is a case where the jury could have, and did, apply its common understanding of the word "torture" to the heinous facts before it to arrive at a fully supported determination that the offense had been committed by means of torture.

As the United States Supreme Court has stated in a related context, it "is neither possible nor desirable for a person to whom the state entrusts an important judgment to decide in a vacuum, as if he had no experiences." *Barclay v. Florida,* 463 U.S. 939, 950 [103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134] (1983). If a court failed to instruct a jury on the legal meaning of negligence in a civil case, and the jury found a defendant negligent who had driven his car at 100 m.p.h. through a crowded pedestrian crossing against a red light, I do not believe we would require a new trial simply because the jury instruction regarding "negligence" was at its "bare bones minimum." We could legitimately review the record and find any inadequacy in the instruction to be harmless. So too in the instant case, where the jury correctly applied its common understanding of the word "torture" and found the existence of that aggravating circumstance (§ 9711(d)(8)), and where the record demonstrates sufficient evidence to support that aggravating circumstance....

(Larsen, J., concurring and dissenting opinion). *See also* Justices McDermott's and Papadakos' concurring and dissenting opinions in *Nelson* ).

PAPADAKOS and McDERMOTT, JJ., join in this concurring opinion.