J-S60040-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL TYRELL HOLSTON | |
| Appellant | No. 223 MDA 2014 |

Appeal from the PCRA Order January 15, 2014
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0005167-2009

BEFORE: OTT, J., STABILE, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                **FILED OCTOBER 28, 2014**

Michael Holston appeals from an order denying his amended petition for relief under the Post Conviction Relief Act ("PCRA")[1]. We affirm.

On January 28, 2011, a jury found Holston guilty of first degree murder[2] and two counts of firearms not to be carried without a license[3]. The trial court sentenced Holston to life imprisonment for first degree murder and to concurrent terms of 3-7 years' imprisonment on each firearm count.

Holston filed post-sentence motions, which the trial court denied, and then a direct appeal. On August 17, 2012, the Superior Court affirmed Holston's judgment of sentence. On February 1, 2013, Holston timely filed a

_____

[1] 42 Pa.C.S. § 9541 et seq.
[2] 18 Pa.C.S. § 2502.
[3] 18 Pa.C.S. § 6106.

pro se PCRA petition in the trial court. The court appointed counsel to represent Holston, and counsel filed an amended PCRA petition.

On November 1, 2013, the court issued a notice of intent to dismiss Holston's amended PCRA petition without a hearing. On January 14, 2014, the court issued an order dismissing Holston's petition. Holston filed a timely notice of appeal and timely Pa.R.A.P. 1925(b) statement.

The trial court summarized the evidence adduced during trial as follows:

> Moshe Cohen, a longtime friend of the victim, seventeen year old David Carr, testified that on July 30, 2009, he and Carr went to the 1900 Block of State Street in Harrisburg to try to buy marijuana from a person known as Source. (Transcript of Proceedings, Jury trial, January 24, 2011-January 28, 2011, pp. 141-142) (hereinafter, 'N.T.') Source was not around. The Defendant Michael Holston spoke with them, and told them that he could get them a half pound of marijuana. (N.T. p. 144).
>
> Cohen made arrangements with a few other friends to pool their money to buy the half pound, and gave it to Carr. (N.T. p. 149). Two days later, on August 2, Cohen met Carr at the Burger King on Cameron Street to obtain the marijuana. The Defendant and a friend of Carr's, Ashton Dickerson, were in Carr's vehicle. (N.T. p. 151) When Carr and Cohen returned home and weighed the marijuana, it weighed 5 ounces, not the 8 ounces for which they paid Holston. Carr took the shorted portion for himself. (N.T. p. 154). Later, on August 7, Carr spoke to Moshe about his intention to visit Defendant the next day and get money back for the shortage. Moshe discouraged him from doing so. (N.T. pp. 158-159).

Video footage taken August 8, 2009, from a nearby restaurant store, shows David Carr's vehicle pull up to 1900 North Street. (N.T. p. 413) A person approached the vehicle; Carr waited in his vehicle for about 17 minutes, then got out of his car and walked to 1905 North Street, near Defendant's address. (N.T. pp. 415-417)

Tanaya Scott lived at 1907 North Street. (N.T. p. 232) She knew Defendant and spoke with him frequently. On the morning of August 8, 2009, Scott spoke to the Defendant and saw him smoking 'water' or 'wet' (embalming fluid) at 8:30 or 9:00 a.m., and also about an hour before the shooting. (N.T. p. 241) Scott testified that it was common for Defendant to smoke water daily. Id. That afternoon, before the shooting, although Scott testified that Defendant was 'bouncing around' and talking a lot, he walked the dog with her son. (N.T. p. 243) When he returned, Defendant took off his necklace, gave it to Scott's son, and told him he was a 'good boy'. (N.T. p. 244) Shortly before the shooting, Scott overheard Defendant talking on the phone and heard him say, 'I'm sorry. I know I got you waiting.' (N.T. p. 246) Scott observed that Defendant had a handgun in his right top pocket, and something heavy in his cargo pants pocket, which he touched frequently. (N.T. pp. 246-247)

Scott observed Defendant walk to the front of the building, and return with David Carr. (N.T. p. 250). Defendant introduced Carr to Scott; Defendant joked that Carr was short, like him, but had big feet. (N.T. p. 250) Scott went into her house.

From her bathroom window, Scott could see down into the alley between 105 and 1907 North Street. (N.T. p. 251) She heard loud talking, and heard Carr say, 'Stop playing,' to which the Defendant replied, "No M-----F-----." She then heard running. (N.T. p. 252) In a written statement to police, Scott stated that she saw Defendant chasing Carr down the alley

3

with his arm outstretched. (N.T. p. 255). She next heard gunshots.

Rabia Kouzouni testified, through an interpreter, that at the time of the shooting, she was taking her trash out from the kitchen door of her house at the 1900 block of State Street. (N.T. p. 220)  From her window, Mrs. Kuzouni saw people arguing, one in a very loud voice. (N.T. pp. 222-223)  She could see that the two people were standing "too close... very close". (N.T. p. 223)  She heard someone say something, which she did not understand[4].  As Mrs. Kouzouni began to take out the trash, she heard gunshots, and retreated inside. (N.T. p. 225)  She hid inside, and heard the sound of someone running. (N.T. p. 226)  She remained in the kitchen, and looked outside to see someone lying down. (N.T. p. 226)

Ed Polston testified that he knew Defendant through Defendant's visits to Polston's sister's house at 1900 North Street.  Polston went to his sister's house on the day of the shooting. When he arrived, someone told him that a person had been shot, and to get in the house. (N.T. p. 228)  As Polston sat on the couch, the Defendant tried to put a gun in Polston's pocket, saying something to the effect of 'just take this' to which Polston responded 'No.' (N.T. p. 290)  Polston and the Defendant then spoke briefly about a mutual friend who owed Polston five dollars. (N.T. p. 291)  The Defendant then left, and went to the store. (N.T. pp. 292-293)

Monique Winston was also at 1900 North Street when she heard that something bad had happened. (N.T. p. 303)  After police arrived at the alley, she went onto the balcony and watched what was occurring on the street. (N.T. p. 305)  Within

---

[4] Her son, who is fluent in English, later translated the word Mrs. Kuzouni heard to be "please, as to beg someone" (N.T. p. 223).

minutes, the Defendant arrived at her house, came into the living room and spoke with Ed Polston. (N.T. pp. 305-306)  Ms. Winston asked Defendant if she could go look out of Defendant's bedroom window, to be able to see where the body was lying. (N.T. p. 312)  Defendant stopped talking, and gave her a blank stare. (N.T. p. 312)  Defendant then left the house, crossed the street, and entered the restaurant store. (N.T. p. 307)  As Ms. Winston watched police lead Defendant out of the store, Defendant yelled to her, 'Mo, call my mom. Don't worry about me. I'll be back. I'm extra wavy.'[5] (N.T. p. 308)

Monique Winston testified that during the time she dated Defendant, she smoked wet with him three or four times a day, and that the effects lasted about forty five minutes, then they would have to smoke it again to get high. (N.T. p. 310)  When Defendant was on wet, he could function, and was not out of control or violent. (N.T. p. 311; N.T. pp. 313-314)

Ed Polston's sister, Monique Polston, was also at 1900 North Street at around 4:30 p.m. on the day of the shooting. (N.T. p. 319)  Soon after she heard that someone had been shot, Defendant arrived. When Ms. Polston asked him what happened, he said he didn't know, that gunshots awoke him, and asked for a cigarette. (N.T. p. 322)  Ms. Polston asked him about the twenty dollars he owed her, to which he responded he would pay her later. (N.T. p. 323) Defendant spoke and walked normally, although he seemed nervous. (N.T. pp. 323-324)

At approximately 4:35 p.m., while working the 3 p.m. to 11 p.m. shift in the Allison Hill area, Sergeant Steven Novacek of the Harrisburg Police received a call of shots fired with a person down at

---

[5] A slang term from a rap song, which witnesses testified Defendant frequently used, purportedly meaning 'cool' (N.T. p. 309).

19th Street and Miller Alley. (N.T. pp. 70-71) Officer Novacek exited his vehicle and walked up the alleyway toward the person down. (N.T. p. 74-75) There, Officer Novacek saw a young white male, in a kneeling position, bent backwards, obviously deceased. (N.T. pp. 75-76) Other officers began responding, preserving the scene, and collecting evidence. (N.T. p. 78)

Officer Kenneth Young of the Harrisburg Police, assigned to a robbery task force, also received a call regarding a shooting at the 1900 Block of Miller Street, with one person deceased. (N.T. pp. 83-84) After arriving at the scene, Officer Young assisted with canvassing neighbors to ask what they may have heard or observed. (N.T. pp. 87-88) Two people indicated that the shooter went into 1900 North Street. (N.T. pp. 88-89) Officer Young observed a person who fit the description of the shooter, later identified as the Defendant, exit the residence, cross the street and enter a store. (N.T. pp. 91-92; N.T. p. 130) Officer Young entered the store. When police spoke to him, the Defendant asked the officer to 'hold on' while he paid for his food. (N.T. p. 94) When asked for identification, Defendant stated that he had a gun in the pocket of his cargo pants, and that the gun was registered. (N.T. p. 95) Defendant then twisted his body to evade search of his right pocket, in which police found another gun which had live bullets in the magazine and one in the chamber. (N.T. pp. 94-95; p. 120; p. 131) [Officer Young] stated that Defendant followed the officers' simple commands, walked and talked normally, and did not exude the pungent odor of PCP. (N.T. pp. 102-103; N.T. p. 124) Inside the store, Defendant cooperated with police. (N.T. p. 100) As Police loaded Defendant in the police van, Defendant yelled to people watching to call his mother, and shouted a phone number. (N.T. p. 325)

Detective Donald Heffner of the Criminal Investigation Division of the Harrisburg Police

6

Department responded to the crime scene at about 4:50 p.m. (N.T. p. 464) After securing the crime scene and assisting officers who apprehended Defendant, Detective Heffner next saw Defendant in the booking room. (N.T. p. 469) Defendant had a tissue or paper towel and was attempting to wipe his hands. Concerned that Defendant was removing gun residue and or blood from his hands, Detective Heffner took the tissue from Defendant. (N.T. p. 471) Defendant was 'passive aggressive', in that he reluctantly followed commands. (N.T. p. 472) Detective Heffner did not seek permission to obtain a blood sample, in that he did not believe Defendant was intoxicated. (N.T. p. 473) When Detective Heffner told Defendant that he would be charged with possession of handguns, Defendant blurted out, falsely, that one of the guns belonged to his mother, and that he had a permit for it. (N.T. pp. 473-474) Investigator William Kimmick of the Harrisburg Police had contact with Defendant in the booking area at approximately 8 p.m. on the night of the shooting, for the purpose of obtaining swabs from his hands to test for gunshot residue. (N.T. p. 403) Defendant did not appear to be under the influence, and was not argumentative, although he ignored commands. (N.T. p. 404)

Wayne Ross, M.D., a forensic pathologist, testified that he conducted an autopsy of David Carr and determined the cause of death as multiple gunshot wounds to the top of the head. Eight bullets entered the head, six penetrated the skull. (N.T. p. 197) Dr. Ross reviewed a photograph of the position of the victim at the crime scene. Dr. Ross opined that the victim was shot from approximately [2 to 3 feet], as evidence by 'stippling', abrasions to the skin caused by gunshot residue. (N.T. pp. 200-202) The wounds were consistent with an 'execution style' killing, that is, within a few feet, over the top of the head, and directly to the brain or skull. (N.T. p. 204)

The defense called Lawrence Guzzardi, M.D., as an expert toxicologist. Dr. Guzzardi testified that based

upon his understanding of the amount of formaldehyde the Defendant smoked, as related to him by Defendant, he did not believe that Defendant was capable of forming the specific intent to commit murder, (N.T. p. 662).

Trial Court Opinion, pp. 2-7.

In his first issue on appeal, Holston argues that his constitutional rights were violated because the police failed to give him **Miranda**[6] warnings before obtaining his custodial statement. Holston has waived this issue by failing to raise it in his original and amended PCRA petitions. **Commonwealth v. Rigg**, 84 A.3d 1080, 1084 (Pa.Super.2013) (Defendant waived claims of ineffective assistance of trial counsel on appeal of dismissal of PCRA petition, where defendant failed to raise the claims in his PCRA petition).

In his second issue on appeal, Holston argues that trial counsel was ineffective for failing to object to the admission of a photograph depicting the victim as it was discovered by the first responding police officer, Sergeant Novacek. We disagree.

In order to prevail on a claim of ineffective counsel, the appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) that defense counsel's action or inaction was not grounded on any reasonable basis designed to effectuate the appellant's interest; and, (3) that the

_____

[6] **Miranda v. Arizona**, 384 U.S. 436 (1966).

appellant suffered prejudice because of the ineffective assistance of counsel. **Commonwealth v. Pierce**, 527 A.2d 973 (Pa.1987). If it is clear that an appellant has not met the prejudice prong of the ineffectiveness standard, the claim may be dismissed on that basis alone. **Commonwealth v. Travaglia**, 661 A.2d 352, 357 (1995); **see also Strickland v. Washington**, 466 U.S. 668, 697 (1984).

Under **Pierce**, the first inquiry is whether the claim that the photograph admitted into evidence was inflammatory must be of arguable merit. The viewing of photographic evidence in a murder case is, by its nature, a gruesome task. However, photographs of a corpse are not inadmissible per se. **Commonwealth v. Hetzel**, 822 A.2d 747, 765 (Pa.Super.2003). Rather, the admission of such photographs is a matter within the discretion of the trial judge. **Commonwealth v. Tharp**, 830 A.2d 519, 531 (Pa. 2003). The court must conduct a two-part test to determine admissibility. First, it must decide if the photograph is inflammatory. If not, the photograph is admissible if it is relevant and can assist the jury's understanding of the facts. If it is inflammatory, the trial court must decide whether or not the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. **Id**. In order for a photograph to be deemed inflammatory, "the depiction must be of such a gruesome nature or be cast in such an unfair light that it would tend to cloud an objective

assessment of the guilt or innocence of the [appellant]." ***Commonwealth v. Dotter***, 589 A.2d 726, 729 (Pa. Super. 1991). The visibility of blood in a photograph, however, does not necessarily require a finding that the photograph is inflammatory. ***Commonwealth v. Crawely***, 526 A.2d 334, 341 (Pa. 1987). Furthermore, the condition of the victim's body provides evidence of the assailant's intent, and even where a medical examiner's testimony can describe the body's condition, such testimony does not obviate the admissibility of photographs. ***Commonwealth v. Rush***, 646 A.2d 557, 560 (Pa. 1994).

Here, the photograph at issue depicted the position of the victim's body when Sergeant Novacek discovered it. The sergeant testified that the photograph at issue showed "what [he] observed as [he] walked up to the wooden fence where the victim was located. It shows the victim in his final resting place that day...his knees bent toward the north, toward the street, and his legs underneath him." (N.T. 75-76). The sergeant confirmed that the photograph was a fair and accurate depiction and displayed exactly how he found the victim's body. (N.T. 76). Despite its gruesome nature, this photograph provided evidence of Holston's intent to murder the victim and assisted the jury in understanding the circumstances of the execution style murder. Therefore, the photograph was relevant in corroborating Sergeant Novacek's testimony as the first responding officer, and it assisted the jury in understanding the circumstances of the murder and Holston's specific

intent to kill.  Holston's claim that it was inflammatory is without arguable merit.

In his third and final issue on appeal, Holston contends that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal.   Holston argues that the evidence of his intoxication negated the Commonwealth's evidence that he had specific intent to kill the victim, thus nullifying his conviction for first degree murder.  We disagree on the ground that this claim lacks arguable merit.

The standard we apply in reviewing the sufficiency of the evidence is

> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Devine*, 26 A.3d 1139, 1145 (Pa.Super.2011).

To sustain a conviction of first-degree murder, the Commonwealth must prove beyond a reasonable doubt that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and a specific intent to kill. *Commonwealth v. Chine*, 40 A.3d 1239, 1242 (Pa. Super. 2012). The Commonwealth may prove the specific intent to kill with circumstantial evidence. For instance, the use of a deadly weapon on a vital part of a victim's body is sufficient to establish the specific intent to kill. *Commonwealth v. Fletcher*, 861 A.2d 898, 907 (Pa. 2004). "The existence of legal malice may be inferred and found from the attending circumstances of the act resulting in the death." *Commonwealth v. Gardner*, 416 A.2d 1007, 1008 (Pa. 1980). "It is well settled that specific intent to kill, as well as malice, may be inferred from the use of a deadly weapon upon a vital part of the victim's body." *Id*.

The defense of intoxication is set forth in 18 Pa.C.S. § 308:

> Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negative the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

*Id*. Evidence of intoxication may be offered by a defendant to reduce murder from a higher degree to a lower degree. *Id*. Intoxication, however, may only reduce murder to a lower degree if the evidence shows that the

12

defendant was "overwhelmed to the point of losing his faculties and sensibilities." ***Commonwealth v. Breakiron***, 571 A.2d 1035, 1041 (Pa.1990). The value of such evidence is generally for the finder of fact, who is free to believe or disbelieve any, all, or none of the testimony addressing intoxication. ***Commonwealth v. Fletcher***, 861 A.2d 898, 908 (Pa.2004).

The Commonwealth presented sufficient evidence at trial to prevail over an intoxication defense. The victim's died from multiple gunshot wounds to the head at close proximity in an execution style murder. (N.T. 197, 204). Multiple witnesses saw Holston with the victim moments before the killing. (N.T. 222-24, 249-50). Although Holston's trial counsel presented evidence to support his intoxication defense through a toxicologist, Dr. Lawrence Guzzardi (N.T. 614-735), the Commonwealth presented multiple witnesses who described that Holston did not exhibit overt displays of intoxication. (N.T. 102-03, 124-25, 323-24, 365, 403-04 472-73, 503-05, 511-12). Finally, Edward Polston testified that Holston tried to give him the murder weapon shortly after the killing, thus displaying Holston's awareness of the criminality of his actions in murdering the victim. (N.T. 290-91).

For these reasons, Holston's claim that his appellate counsel provided ineffective assistance is devoid of substance.

Order affirmed.

13

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/28/2014</u>