J-S07020-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
PETER ATEM :
:
Appellant : No. 3380 EDA 2016

Appeal from the Judgment of Sentence September 30, 2016
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0001977-2015

BEFORE: BENDER, P.J.E., PANELLA, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, J. **FILED AUGUST 21, 2018**

Peter Atem appeals from the judgment of sentence of life-without-parole ("LWOP") entered following his first-degree murder conviction. Atem raises multiple challenges to the trial court's rulings during trial and to the propriety of his LWOP sentence. We affirm.

On February 19, 2016, Atem was arrested and charged with the murder of his coworker, Danny Vazquez. The case proceeded to a jury trial. The evidence presented at trial, as summarized by the trial court, is as follows:

> On February 18, 2015, around 8:00 A.M., [Atem] repeatedly stabbed and killed his co-worker, [ ] Vazquez [], at the JBS MOPAC rendering plant in Franconia Township, Montgomery County, Pennsylvania. After stabbing [Vazquez] in the filter room of the plant, [Atem] made his way to the filter room shed where he attempted to take his own life by stabbing his torso and slashing his neck. Despite his self-inflicted wounds, [Atem] survived after being air-lifted and receiving treatment at the Paoli Memorial Hospital. The "black, butterfly-style" knife used by [Atem] to stab [Vazquez] and himself was found near [Atem's] torso along with

a handwritten suicide note that read: "You think you can destroyed [sic] my life in front of my family and friends and the all [sic] world and lived [sic]. When you set out to destroye [sic] people [sic] life for no reason you make sure they [sic] dead, see you in hell. Life for life."

Eye-witness and co-worker, James Artis, worked at JBS MOPAC rendering plant in the filter room on the day of the stabbing murder, February 18, 2015. [] Artis testified [Vazquez] was resting on a chair in the filter room when [Atem] entered, stood silently in the doorway, and exited the room. [Atem] then re-entered the room, and without warning or any obvious provocation, physically confronted [Vazquez]. [Vazquez] got [Atem] off of him, but did not otherwise get physical with [Atem]. Instead [Vazquez] asked [Atem] what his problem was, as did [] Artis. [] Artis specifically asked if [Atem] was "alright' and could [Vazquez] have done something bad enough to cause this interaction, to which [Atem] nodded affirmatively. [] Artis testified [Atem's] demeanor, though usually quiet, was "a tad bit off" that day. [Vazquez] continued to ask [Atem] why he jumped on him, and warned that if [Atem] continued not to answer [Vazquez's] question, he would report the incident to the office where the supervisors are located. [] Artis went back to work but continued to overhear [Vazquez] questioning [Atem], and eventually heard [Vazquez] shrieking. [] Artis turned and saw [Atem] stabbing [Vazquez].

In describing the stabbing, [] Artis demonstrated that [Atem] had his arms crossed over [Vazquez's] chest while stabbing [Vazquez] with his right hand in the center of [Vazquez's] chest and underneath [Vazquez's] neck. [] Artis next saw [Vazquez] running and screaming toward the exit [and] helped [Vazquez] up a small hill outside the filter room leading to the front office, leaving [Atem] behind in the filter room. When [Vazquez] and [] Artis made it to the front office, [Vazquez] told Ralph Hendricks, a plant supervisor that JBS, that [Atem] stabbed him. One of the supervisors in the front office called 9-1-1, while another contacted JBS in-house medical unit and then attended to [Vazquez]. [Despite their attempts, Vazquez did not survive.] …

\*\*\*

[Atem] made several statements to police between February 19 and 20, 2015. [Atem] stated he began working at JBS MOPAC on

September 8, 2004, "going on eleven [] years" before the stabbing-murder. At the rendering plant, [Atem] heard [Vazquez] tell others "he was going to destroy" [Atem] numerous times. Appellant explained the knife used to stab [Vazquez] was already in his locker before the incident, and described the knife as a black, "butterfly-style" knife. [Atem] admitted he did not routinely carry this knife on his person, but retrieved the knife from his locker and placed it in his jacket pocket before he confronted [Vazquez]. He also confessed to starting the physical confrontation with [Vazquez] on February 18, 2015, because he feared [Vazquez] was going to do something with alleged pictures of [Atem] that were taken and/or stored on [Vazquez's] phone. Interestingly, Detective [Jack] Wittenberger searched [Vazquez's] cell phone following his murder, finding no evidence of these alleged pictures.[] [Atem] became angry when [Vazquez] threated to report the confrontation to the front office, so he stepped outside to cool off. As [Atem] attempted to cool off, [Vazquez] grabbed his jacket sleeve, at which time [Atem] began stabbing [Vazquez]. Though [Atem] was angry, he said he did not want to kill [Vazquez]; yet, he admitted that after stabbing [Vazquez] multiple times, he went to the shed and attempted to commit suicide. After [Atem] stabbed himself, he wrote the suicide note on paper he found in the shed. [Atem] also told detectives he does not suffer from any illnesses, including mental illness, and that he is right-handed.

On February 19, 2015, Dr. Isidore Mihalakis, Deputy Coroner for Montgomery County at the time, performed [Vazquez's] autopsy, consisting of an internal and external examination.[]… [Dr. Mihalakis observed that Vazquez] had at least ten [] separate stab wounds, one [] of which was a four [] inch deep neck wound severing [Vazquez's] deep jugular vein. This particular wound was in the area containing all the major vessels from the heart to the brain. Another wound in [Vazquez's] shoulder/upper left arm region cut his vital subclavian artery. There was yet another wound in a vital area on [Vazquez's] body in the chest near the heart.

… Dr. Mihalakis opined to a reasonable degree of medical certainty that the cause of [Vazquez's] death was multiple stab wounds and the manner of death was homicide.[] According to Dr. Mihalakis, the wound to [Vazquez's] neck and upper arm caused the most damage and were very likely made early on, given the more extensive hemorrhaging that took place. Two [] of

[Vazquez's] wounds rendered his biceps almost totally useless and inhibited his ability to fight [Atem] off. This conclusion was bolstered by the lack of classic defensive wounds on [Vazquez's] body – wounds resulting from attempts to ward off an assailant. Notably, one [] wound was upward and backward, indicating [Atem] came from behind to stab [Vazquez] for at least one [] of the stabbings. There was evidence of some physical struggle between [Vazquez] and [Atem]. The multiple wounds, including the two [] most damaging, reduced the amount of time he had to survive. All the wounds were consistent with the "butterfly-style" knife retrieved by police.

\*\*\*

… JBS employees testified that they knew both [Atem] and [Vazquez], and there were no obvious issues or racial tension between them. Moreover, all but one [] JBS employee testified consistently about the JBS policy at the rendering facility prohibiting all personal knives and authorizing only the use of a box-cutter within the facility.[] …

Notably, JBS employees also testified [Atem] should not have been at work on February 18, 2015, the day of the stabbing-murder, nor did [Atem] clock-in. [Atem] also appeared uncertain that morning about whether he [was] coming into work when communicating with his co-worker, Kevin Brown.

[Atem] did not testify in this case or call any witnesses to put his history into evidence, though it was a central issue in the case, as [Atem's] defense was Post-Tramatic Stress Disorder (PTSD) resulting from his unfortunate childhood as a child soldier in Sudan, prevented him from forming the requisite intent for homicide on February 18, 2015. [Atem's] history was analyzed and borne out by expert witnesses, as well as in defense counsel's opening statement and closing argument, though most of the information was not admitted as substantive evidence. Consequently, the jury was specifically instructed on the factual bases for expert opinions.

\*\*\*

While the recitation of [Atem's] childhood history [was] fairly consistent in all three [] experts' reports, their conclusions varied. [Atem's] testifying expert, Dr. [Alisa] Gutman, concluded

- 4 -

[Atem] suffered from PTSD symptoms on February 18, 2015, and therefore, *did not form* the requisite intent for murder. The Commonwealth's expert, Dr. John O'Brien testified his opinion was not inappropriately conclusory as he believed Dr. Gutman's opinion to be, and concluded [Atem] did not suffer from PTSD on February 18, 2015, and was *capable* of forming the requisite intent for murder. Finally, defense expert, Dr. Kenneth Weiss, failed to conclude whether [Atem] did or did not suffer from PTSD symptoms at the time of the stabbing murder; therefore his testimony was limited on sur[-]rebuttal, insomuch as it rebutted the Commonwealth's expert's references to his report.

Trial Court Opinion, 4/21/2017, at 1-2, 7-12 (internal citations to the record omitted). Following the close of evidence, the jury convicted Atem of first-degree murder and possessing an instrument of crime. The trial court later sentenced Atem to a mandatory LWOP sentence for first-degree murder.

Atem filed a timely post-sentence motion in which he challenged the weight of the evidence presented at trial and the excessiveness of his LWOP sentence. The trial court denied Atem's motion, without a hearing. This timely appeal follows.

On appeal, Atem raises the following issues for our review:

1. Whether the defense was improperly precluded from eliciting relevant information regarding [Atem's] state of mind that would have dispelled the notion he committed first degree murder.

2. Whether the trial court erred in sustaining the objection as to Doctor Weiss' [sic] proposed testimony that would have dispelled the notion [Atem] committed first degree murder.

3. Whether the trial court erred in refusing to give an involuntary manslaughter charge.

4. Whether the trial court erred in overruling defense counsel's objection to the prosecution's argument to the jury regarding voluntary manslaughter, provocation and self-defense.

5. Whether the trial court erred in overruling the objection of defense counsel to the prosecution's argument that the defense was nothing more than an attempt to garner sympathy.

6. Whether the trial court erred in allowing a flight/consciousness of guilt instruction.

7. Whether the prosecutor engaged in misconduct when, in pretrial motions, the trial court directed the prosecutor not to solicit any opinion evidence as to the character of the deceased and thus try to invoke sympathy for the deceased.

8. Whether the verdict of first degree murder was against the weight of the evidence.

9. Whether the mandatory life term received by [Atem] is excessive and amounts to cruel and unusual punishment in contradiction to the Eighth Amendment.

Appellant's Brief, at 12 (unnecessary capitalization omitted).

Appellant raises *nine* issues for our review. Raising so many issues reminds us of Justice Robert H. Jackson's warning about such an approach:

Legal contentions, like the currency, depreciate through overissue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at a lack of confidence in any one. Of course, I have not forgotten the reluctance with which a lawyer abandons even the weakest point lest it prove alluring to the same kind of judge. But experience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.

Ruggero J. Aldisert, J. "Winning on Appeal: Better Briefs and Oral Argument," at 130 (2d ed. 2003) (quoting Robert H. Jackson, "Advocacy Before the United States Supreme Court," 37 Cornell L.Q. 1, 5 (1951)).

This "much quoted" advice, unfortunately, "often 'rings hollow'...." *Commonwealth v. Robinson*, 864 A.2d 460, 480 n.28 (Pa. 2004) (citing Ruggero J. Aldisert, J. "The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982)). But its importance cannot be overstated. *See*, *e.g.*, *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983) ("Experienced advocates since time beyond memory emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues"); *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) ("[O]ne of the most important parts of appellate advocacy is the selection of the proper claims to urge on appeal. Throwing in every conceivable point is distracting to appellate judges, consumes space that should be devoted to developing the arguments with some promise, inevitably clutters the brief with issues that have no chance … and is overall bad appellate advocacy."); Aldisert, *supra* at 129 ("When I read an appellant's brief that contains more than six points, a presumption arises that there is no merit to *any* of them.")

Atem's first two issues challenge the trial court's rulings relating to the admissibility of evidence during trial.

The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. Thus[,] our standard of review is very narrow. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

**Commonwealth v. Lopez**, 57 A.3d 74, 81 (Pa. Super. 2012) (quotation marks and citation omitted).

In his first issue, Atem claims that the trial court erred in precluding him from refuting the Commonwealth's claim that Atem was a "bad employee" by providing a reason for his absenteeism.[1] A review of the trial transcript, however, reveals Atem never raised this claim at trial.[2] We find it waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")

---

[1] Atem also contends in his brief that the trial court erred by admitting this "bad employee" evidence in the first place. **See** Appellant's Brief, at 19-22. However, as the trial court concludes, and the record reflects, Atem has failed to preserve this issue for our review. **See** Trial Court Opinion, 4/21/17, at 32-33 (finding Atem's failure to object to the introduction of evidence concerning Atem's absenteeism waived the issue for appellate review). **See also** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.")

[2] There is an indication in the record that there were two unrecorded sidebars. Perhaps this claim was raised then. Perhaps not. There is no way to tell. And, tellingly, Atem does not indicate where he preserved this issue for our review. **See** Pa.R.A.P. 2117(c); Pa.R.A.P. 2119(e). The burden to preserve this issue for our review fell squarely on Atem.

Next, Atem challenges the trial court's decision to limit Dr. Weiss's testimony on sur-rebuttal to a rebuttal of Dr. O'Brien's statement indicating that Dr. Weiss had concluded Atem did not have PTSD.[3] Atem argues that Dr. Weiss should have been permitted to expand her testimony and explain the effects of "horse play" on a person with PTSD, as this issue was relevant in supporting an argument for imperfect self-defense. However, as the Commonwealth notes, Atem has failed to preserve this issue by failing to object to the trial court's ruling limiting the scope of the sur-rebuttal prior to allowing Dr. Weiss to take the witness stand.

"Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "[I]t is axiomatic that issues are preserved when objections are made timely to the error or offense." **Commonwealth v. Baumhammers**, 960 A.2d 59, 73 (Pa. 2008) (citations omitted). Here, defense counsel did not object when the trial court indicated the limited scope of Dr. Weiss's testimony; in fact, the transcript reveals that defense counsel agreed that Dr. Weiss's testimony would be limited as such. **See** N.T., Trial, 6/9/16, at 161. Therefore, we find this argument waived.

In his fourth, fifth, and seventh issues, Atem raises claims of prosecutorial misconduct. Specifically, Atem claims that the prosecutor's

---

[3] Atem does not challenge the trial court's decision to preclude Dr. Weiss's expert testimony, but *only* challenges the trial court's decision to limit Dr. Weiss's testimony on sur-rebuttal. **See** Appellant's Brief, at 37. Therefore, we have limited our analysis to this specific issue.

actions in eliciting testimony about the character of the victim, as well as inaccurately characterizing the defense as one that relied upon sympathy for the victim and a justification defense, constituted prosecutorial misconduct sufficient to require a new trial. However, our review of the record reveals that Atem has failed to preserve *any* of these challenges for our review.

"It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." **Commonwealth v. Baez**, 720 A.2d 711, 729 (Pa. 1998) (citation omitted). As such, if a defendant perceives prosecutorial misconduct during the course of trial, he must allow the trial court the opportunity to correct the error at the time it is made. **See**, **e.g.**, **Commonwealth v. Clair**, 326 A.2d 272, 274 (Pa. 1974) ("[A] party may not remain silent and afterwards complain of matters which, if erroneous, the court would have corrected.")

In order to allow for this opportunity, defense counsel must not only object to the perceived misconduct, but also request a mistrial or curative instruction at the time the perceived misconduct occurs. **See Commonwealth v. Strunk**, 953 A.2d 577, 578 (Pa. Super. 2008). Failure to request either of these remedies waives claims of misconduct on appeal – even where defense counsel notes his objection to the perceived misconduct. **See Commonwealth v. Sandusky**, 77 A.3d 663, 670 (Pa. Super. 2013).

Here, while defense counsel objected to three claims of perceived misconduct by the prosecution, he failed to request a mistrial or curative instruction to remedy these issues at any point during trial.[4] *See* N.T., Trial 6/7/16, at 117 (objecting to evidence of victim's character); N.T., Trial, 6/9/16, at 238-239 (objecting to prosecution's reference to sympathy during closing); N.T., Trial, 6/9/16, at 225 (objection to prosecution's reference to justification defense). As Atem failed to request a new trial based upon any of these alleged claims of misconduct with the trial court, we cannot grant him this relief now.

In his next two issues, Atem contests the trial court's rulings relating to jury instructions. First, in issue three, Atem challenges the trial court's refusal to instruct the jury on involuntary manslaughter. Atem asserts that because horseplay was common at work and he did not intend to kill Vazquez, there was evidence from which a jury could have assumed that Vazquez's death was simply an accident resulting from horseplay. Therefore, Atem argues, the issue of involuntary manslaughter was fairly before the jury.

---

[4] In fact, Atem's objection to the testimony concerning Vazquez's character was sustained, and a curative instruction was issued to the jury. Atem did not object to the curative instruction. As such, we could have found Atem waived this specific claim on this basis. *See Commonwealth v. Boring*, 684 A.2d 561, 568 (Pa. Super. 1996) (finding claims of prosecutorial misconduct are waived when a defendant's objection to a prosecutor's statement is granted and no additional relief is requested).

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." ***Commonwealth v. Baker***, 24 A.3d 1006, 1022 (Pa. Super. 2011) (citations omitted; brackets in original). An "[involuntary] manslaughter charge shall be given only when requested, where the offense has been made an issue in the case, and the trial evidence reasonably would support such a verdict." ***Commonwealth v. Patton***, 936 A.2d 1170, 1177 (Pa. Super. 2007) (citations omitted). "A person is guilty of involuntary manslaughter when as a direct result of doing an unlawful act in a reckless or grossly negligent manner … he causes the death of another person." 18 Pa.C.S.A. § 2504(a).

Despite Atem's claims to the contrary, we cannot find any evidence to support the claim that Atem's stabbing of an unarmed victim was a reckless or grossly negligent result of horseplay. The evidence was uncontroverted at trial that Atem initiated and escalated the altercation—and then proceeded to stab an unarmed Vazquez ten times. Neither party presented any evidence from which a jury could have inferred that this incident started out as horseplay. Therefore, because a jury could not have reasonably found that these actions constituted the mere recklessness or gross negligence required to support an involuntary manslaughter conviction, we cannot find that the trial court erred in refusing to give this instruction to the jury.

In his sixth issue on appeal, Atem purports to challenge the trial court's inclusion of the flight/consciousness of guilt instruction to the jury. However, because Atem failed to object to the inclusion of this instruction at trial, we agree with the trial court's determination that Atem has waived this issue for our review. *See* Trial Court Opinion, 4/21/17, at 50-51.

We reiterate that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). In order to preserve a specific claim that a jury instruction was erroneous, a defendant must object to the charge at trial. *See Commonwealth v. Spotz*, 84 A.3d 294, 318 n.18 (Pa. 2014). *See also* Pa.R.A.P. 302(b) ("A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of.")

Here, the trial court clearly indicated its plan to instruct the jury on flight/consciousness of guilt during the charging conference. **See** N.T., Trial, 6/9/16, at 167. And, as indicated, the trial court included this instruction in its charge to the jury. *See id*., at 260. Atem did not object to the trial court's inclusion of this instruction at either of these opportunities. Therefore, he has waived his right to challenge this aspect of the trial court's charge on appeal.

Next, Atem argues that his first-degree murder conviction was against the weight of the evidence presented at trial. Specifically, Atem concludes that several aspects of the testimony of the Commonwealth's expert witness, Dr.

O'Brien were defective and, therefore, improperly considered by the jury in its deliberations.

We do not review challenges to the weight of the evidence *de novo* on appeal. **See Commonwealth v. Rivera**, 983 A.2d 1211, 1225 (Pa. 2009). Rather, we only review the trial court's exercise of its discretionary judgment regarding the weight of the evidence presented at trial. **See id**. "[W]e may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice." **Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003) (citations omitted). A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." **Commonwealth v. Davidson**, 860 A.2d 575, 581 (Pa. Super. 2004) (citations omitted).

Here, the trial court acknowledged the appropriate legal standards in addressing Atem's challenge and examined the record in the face of Atem's claim that the testimony of Dr. O'Brien was faulty. After a careful review, the trial court concluded that Dr. O'Brien's opinion was, in fact, proper and supported by information of record. **See** Trial Court Opinion, 4/21/17, at 22-28. After making this determination, the trial court reviewed the jury's verdict and concluded the verdict did not shock its conscience. Having reviewed the

record, we cannot conclude the trial court abused its discretion. Thus, Atem's weight of the evidence claim fails.

Finally, Atem contends that his LWOP sentence constitutes cruel and unusual punishment in violation of the Eight Amendment to the United States Constitution. Specifically, because of his childhood experiences and his PTSD, Atem argues that a sentence of LWOP is excessive and the premise behind the holding in **Miller v. Alabama**, 567 U.S. 460 (2012), "that life without parole constitutes a cruel and unusual punishment for juvenile applies (or, alternatively, should apply) to the instant case." Appellant's brief, at 74.

**Miller** is unambiguously limited to *juvenile* offenders. **See** 567 U.S. at 465. Atem was thirty-one at the time of his crime. This, alone, is a basis for rejecting Atem's claim. However, for the sake of completeness, we will address Atem's implicit claim that the lack of individualized sentencing in a mandatory LWOP sentence constitutes cruel and unusual punishment.

In Pennsylvania, our legislature has determined that an adult convicted of first-degree murder can only receive one of two sentences: death or LWOP. **See** 18 Pa.C.S.A. § 1102(a)(1). Therefore, in situations in which the Commonwealth does not seek the death penalty, the trial court does not have any discretion in imposing sentence; it must impose a LWOP sentence following a first-degree murder conviction. **See id**.

The constitutionality of this sentencing statue has already come before this Court. In **Commonwealth v. Yount**, 615 A.2d 1316 (Pa. Super. 1992),

a defendant challenged the constitutionality of imposing a life sentence in a non-capital case. In determining that a mandatory sentence of LWOP is constitutional following a first-degree murder conviction, the court noted that "[t]he Eighth Amendment requirement for individualized consideration of offender and crime in capital cases has not been extended to noncapital cases." *Id*., at 1321 (citation omitted). As such, the court must impose "the mandatory sentence of life imprisonment for first degree murder[] … [without] consideration of aggravating or mitigating circumstances." *Id*. (citations omitted).

As a non-individualized LWOP sentence for first-degree murder has been deemed constitutional by our courts, Atem's final argument on appeal, fails.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/21/18