COMMONWEALTH of Pennsylvania, Appellee

v.

Neal Lamont PATTON, Appellant.

Superior Court of Pennsylvania.

Submitted Feb. 28, 2007.

Filed Nov. 19, 2007.

Kirk J. Henderson, Pittsburgh, for appellant.

Sandra Preuhs, Asst. Dist. Atty. and Michael W. Streily, Deputy Dist. Atty., Pittsburgh, for Com., appellee.

BEFORE: MUSMANNO, BOWES and JOHNSON, JJ.

OPINION BY BOWES, J.:

¶ 1 Neal Patton appeals from the judgment of sentence imposed after he was convicted by a jury of first degree murder. We affirm.

¶ 2 The record establishes that on the evening of August 25, 2003, twenty-two-year-old Appellant shot and killed his twenty-year-old brother, Anthony, in front of an apartment building located at 530 North Euclid Street in the East Liberty neighborhood of Pittsburgh. Appellant promptly fled to Cleveland, Ohio, where he was arrested in connection with the shooting approximately six months later. On March 25, 2004, Appellant was transported back to Pittsburgh and interviewed by Allegheny County Detective Dennis Logan. After receiving *Miranda* warnings, Appellant gave written and audiotaped statements implicating himself in the killing. Appellant subsequently filed a motion to suppress those statements, which was denied. The case proceeded to a jury trial on February 23, 2005.

¶ 3 At trial, the Commonwealth presented the testimony of Loenell Howze, an eyewitness who had been conversing with the victim on a street corner moments before the shooting occurred. Mr. Howze testified that Àppellant walked up to Anthony, who was sitting on a fire hydrant, and asked "if [Anthony] was still talking shit." N.T. Trial, 2/23/05, at 56. Anthony stood up to confront Appellant but did not respond. Appellant pulled out a small handgun and immediately fired the weapon at "point blank" range, wounding Anthony in the pelvis. *Id.* at 60. Anthony fell to the ground and lay motionless near the curb. Seconds later, Appellant walked up to his brother, placed the gun near Anthony's right temple, and pulled the trigger, thereby inflicting a traumatic head wound that proved to be fatal. Appellant then proceeded to "walk away like nothing [had happened]." *Id.* at 63.

¶ 4 Appellant took the witness stand and testified in his own defense. Consistent with his prior statements to Detective Logan, Appellant testified that he and Anthony both resided at their parents' home in East Liberty and that in the days leading up to the shooting, Anthony, who frequently drank and smoked marijuana, secretly entered Appellant's bedroom on multiple occasions and stole clothing and money. As a result, Anthony was repeatedly ordered to vacate the house, but his parents always allowed him to return. These incidents engendered hostility between Appellant and Anthony and often prompted physical altercations.

¶ 5 Appellant stated that during the summer of 2003, he learned that an unnamed acquaintance kept a loaded .32 caliber revolver hidden near Peabody High School. Appellant located the revolver, which was wrapped in a handkerchief to eliminate fingerprints, and moved it to a new location approximately one block from his home. Appellant claimed he never took the gun into the house; rather, he kept the weapon in a secret "stash place" and concealed it under "weeds and dirt." N.T. Trial, 2/24/05, at 52, 54. Appellant also testified that he started carrying the gun for personal protection two days before this incident occurred. *Id.* at 53.

¶ 6 On the day of the shooting, Appellant discovered that someone had broken into a locked trunk in his bedroom and removed some clothing. Appellant walked downstairs and confronted Anthony, who denied knowledge of the theft. Appellant returned to his room, retrieved some school supplies, and then left the house to attend classes at a vocational school located in downtown Pittsburgh. When Appellant returned home later that evening, his father, Henry Patton, stated that Anthony

informed him that Appellant had a gun. *Id.* at 27. As guns were not allowed on the premises, Henry told Appellant that he could not sleep at the house that night. Consequently, Appellant went to his room, placed some personal belongings in a garbage bag, and left the house at approximately 9:30 p.m. Upon exiting the residence, Appellant proceeded to the location where the revolver was buried, retrieved the gun, and placed it in his pocket.

¶ 7 Approximately ten minutes later, as he was walking to a bus stop on Negley Avenue, Appellant encountered Anthony, who was standing near a residential fire escape with Mr. Howze. Appellant testified that Anthony immediately began shouting profanities at him and ridiculed Appellant for being expelled from their parents' home, stating, "Hi bitch, you still got your gun?" *Id.* at 39. Appellant replied, "[Y]es, I heard it was supposed to be taken off of [me]." *Id.* at 41. Anthony then began walking toward Appellant in a manner which indicated that he wanted to fight Appellant. *Id.* Appellant claimed the shooting occurred in the following manner:

Upon getting close enough to reach out to me is when [Anthony] tried to do so. At that time, my right hand was free so I had reached into my right pocket and pulled the gun out when he got close enough to reach me. He was so close, in fact, that I purposefully cocked the hammer so he could understand that I had a gun in case he did [not] see it. This did not stop him at [sic] any form or fashion. He continued to try to grab me and physically do me harm, so at that time is when I tried to point it at him. He hit my arm and that caused the first gunshot to go off.

. . . .

At that time, we both noticed that he was bleeding from the midsection area, so I looked at him ... and I tried to proceed past him at that time. He then again looked at me angrily and came at me again and made a lunge type effect at me, jumping at me but he couldn't come directly at me because he had been hit before.

. . . .

He was standing right in front of me. I was standing here and he made like a lunging attack at me, trying to grab me and the gun. At that time, I stood with my gun but stepped aside with the gun in my hand. When he lunged past me, the second shot went off and it hit him beside the head area. He lunged past me. He couldn't walk toward me so he lunged at me. When he missed me, he hit part of my arm, but he could not stand or walk so ... he was lunging.

*Id.* at 41–43. Appellant subsequently left the scene, discarded the handgun, made a brief visit to the hospital where his brother subsequently died, and then fled to Ohio.[1] Appellant conceded that he never told his parents or police about his involvement in the shooting until after he was arrested and returned to Pittsburgh to face homicide charges. *Id.* at 72.

¶ 8 The jury convicted Appellant of first degree murder, and the trial court imposed a mandatory sentence of life imprisonment on May 24, 2005. Appellant's post-sentence motion was denied by operation of law on November 17, 2005. This timely appeal followed, wherein Appellant contends that: (1) the prosecutor made a highly prejudicial remark during her closing argument to the jury; and (2) the trial

---

**1.** Police recovered a .32 caliber revolver from the area, and forensic analysis confirmed that it was the murder weapon. The gun's cylinder was found to contain four live cartridges and two empty shell casings. *Id.* at 221–22.

court erred in refusing to charge the jury on the crime of voluntary manslaughter.

¶ 9 Appellant's first argument is that the prosecutor committed misconduct during her closing argument when she stated:

Ladies and gentlemen, I'm asking you to find a verdict of guilty of murder in the first degree and send a message back that [Loenell Howze] did the right thing. The [criminal justice] system works and it's right to come forward and tell what happened and the second message I want to send to the defendant is to tell him he can't get away with murder.

N.T. Trial, 2/25/05, at 107–108. Appellant maintains that the prosecutor's remarks were inflammatory and deprived Appellant of his right to an impartial jury under *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102 (2004), and similar cases where our Supreme Court has opined that prosecutors cannot ask jurors to "send a message" to the community, the justice system, or potential criminals by recommending the death penalty for capital offenses.[2] *See, e.g., Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190 (1997); *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221 (1995); *Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334 (1987).

¶ 10 Based on our review of the record, we find that no relief is due. The prosecutor's comments, although inappropriate, were not made in an effort to procure a death sentence;[3] accordingly, we are not persuaded that a new trial is warranted under *DeJesus*, wherein the Supreme Court held that prosecutors should never ask jurors to impose the death penalty in order to "send a message" because such arguments are highly prejudicial and induce verdicts that are based on emotion rather than reflective judgment. Moreover, when viewed in context, the statements herein were not so egregious as to deny Appellant a fair trial.

[C]omments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Also, a prosecutor's comments must be examined within the context in which they were made. Moreover, a jury's determination must be based solely upon the evidence and not a prosecutor's emotional appeal or crusading incitation to make a statement to the judicial system or to convince the jury that a certain verdict is necessary as a form of retribution for the ills inflicted on society by a certain class of people.

*Hall, supra* at 294, 701 A.2d at 202–203 (internal citations omitted).

¶ 11 In the instant case, the jury was asked to determine whether the shooting was accidental or whether it constituted first or third degree murder. Appellant claimed he never intentionally fired the gun at his brother, whereas Mr. Howze testified that Appellant deliberately shot Anthony in the head after wounding him in the midsection. As Mr. Howze was the

---

**2.** The Commonwealth posits that this issue is waived because Appellant's counsel did not lodge a second objection after the trial court failed to give a curative instruction relating to the prosecutor's comments at the conclusion of the trial. *See* Commonwealth brief at 12 n. 3. We hold that counsel's contemporaneous objection to the remarks and his immediate request for a cautionary instruction were sufficient to preserve the issue for our review.

**3.** The Commonwealth did not seek the death penalty in this case.

only eyewitness to the shooting, his testimony was a key component of the Commonwealth's case-in-chief; however, Mr. Howze stated on direct examination that he was reluctant to discuss the incident with police because he was taught to avoid talking about local crimes. *See* N.T. Trial, 2/23/05, at 65. Therefore, at the conclusion of her closing argument, the prosecutor asked the jury to "send a message . . . that [Loenell Howze] did the right thing." N.T. Trial, 2/25/05, at 107–108.

¶ 12 Contrary to Appellant's position, the prosecutor's remark did not improperly suggest that "a verdict other than first-degree murder would have sent the message that talking to the police is a worthless endeavor." Appellant's brief at 20. The statement merely implied that Mr. Howze should be commended for assisting homicide investigators, and thus, we find that it did not constitute an attempt to diminish the objectivity and impartiality of the jury. Consequently, the prejudicial impact of this statement, if any, was minimal.[4] *Accord Hall, supra* (prosecutor's objectionable comments related to facts surrounding murder and were not so prejudicial as to require a new trial); *cf. Commonwealth v. Poplawski*, 852 A.2d 323 (Pa.Super.2004) (new trial ordered where prosecutor argued that certain firearms serve no legal purpose and urged jury to send a message that any type of dispute-related shooting would not be tolerated in the community).

■ ¶ 13 Similarly, the prosecutor's comment that the jury should send a message that "[Appellant] can't get away with murder" was not reversible error. Our Supreme Court has specifically held that such statements are permissible in criminal trials. *See Commonwealth v. Peterkin*, 538 Pa. 455, 649 A.2d 121 (1994) (prosecutor's exhortation to jury to send a message to defendant in murder trial did not constitute misconduct); *see also DeJesus, supra.* Hence, we need not address this issue further.

■ ¶ 14 Appellant's final argument is that the trial court erred in refusing to charge the jury on voluntary manslaughter. Appellant asserts that he was entitled to this charge because his testimony indicated that he shot his brother while acting under a sudden and intense passion caused by the animosity generated by the thefts and physical altercations that occurred in the days leading up to the shooting. Consistent with this view, Appellant contends that the trial court should have given an instruction pursuant to *Commonwealth v. McCusker*, 448 Pa. 382, 389, 292 A.2d 286, 290 (1972), wherein our Supreme Court held that a homicide defendant may rely "upon the cumulative impact of a series of related events" to establish adequate provocation to support a conviction for voluntary manslaughter.[5]

---

4. The prejudicial effect of this statement was further diminished by the trial court's subsequent instruction directing jurors to "base your verdict only on the facts and the law as you heard them during the course of the trial and no other basis." N.T. Trial, 2/25/05, at 119–120.

5. The Commonwealth argues that this claim is waived for failure to object to the omission of the charge at trial. *See* Pa.R.Crim.P. 647(B) (omissions from jury charge may not be assigned as error unless specific objections are lodged before jury retires to deliberate). However, our Supreme Court did not clarify the procedure for preserving challenges to jury instructions until November 29, 2005, in *Commonwealth v. Pressley*, 584 Pa. 624, 887 A.2d 220 (2005). As there were divergent views regarding preservation of jury instruction issues at the time of Appellant's trial and the Supreme Court held that the rule announced in *Pressley* was to be applied prospectively, *see id.* at 632, 887 A.2d at 225, we decline to find waiver in this instance.

¶ 15 In reviewing such claims, we adhere to the following principle:

> [A] trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict.... Instructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury.

*Commonwealth v. Browdie*, 543 Pa. 337, 349–50, 671 A.2d 668, 674 (1996); *see also Commonwealth v. Carter*, 502 Pa. 433, 466 A.2d 1328 (1983) (voluntary manslaughter charge is appropriate only when that crime is made an issue in the case, and evidence would support such a verdict).

¶ 16 The crime of voluntary manslaughter is codified at 18 Pa.C.S. § 2503, which provides in relevant part:

> **(a) General rule.**—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) the individual killed; or
>
> (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
> **(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

¶ 17 In the instant case, the trial court declined to give a voluntary manslaughter instruction based on its determination that Appellant's version of the shooting "would not support a voluntary manslaughter conviction." Trial Court Opinion, 4/24/06, at 3. The record supports the court's ruling.

¶ 18 As noted *supra*, Appellant maintained that he never intended to shoot his brother, who was unarmed. Appellant made this contention on direct examination, *see* n.t. trial, 2/24/05, at 41–43, and again on cross-examination, stating, "I was not intending to pull [the trigger]." *Id.* at 66. Thus, Appellant characterized the shooting as accidental. Seizing upon this fact and the fact that Mr. Howze testified that Appellant appeared calm as he inflicted the fatal head wound and left the scene, the Commonwealth asserts that the trial court properly determined that the trial evidence would not have supported a voluntary manslaughter conviction.

¶ 19 Our Supreme Court's decisions in *Carter*, *supra*, and *Browdie*, *supra*, are instructive on this issue. In *Carter*, the defendant testified that he accidentally shot the victim as they were wrestling for control of the defendant's gun following a verbal altercation. The Commonwealth presented conflicting evidence that the defendant recklessly fired multiple shots at the unarmed victim from a distance after the victim damaged the front door to the defendant's home. At the conclusion of the evidence, the trial court instructed the jury on, *inter alia*, third degree murder and "heat of passion" voluntary manslaughter under 18 Pa.C.S. § 2503(a). However, the court did not charge the jury on "imperfect self-defense" voluntary manslaughter codified at section 2503(b). The defendant was convicted of third degree murder and subsequently appealed, arguing that his attorney was ineffective for failing to object to the trial court's failure to instruct the jury on the entire statutory definition of voluntary manslaughter.

¶ 20 Our Supreme Court granted allowance of appeal to address the defendant's contention that every defendant charged with murder had an unconditional right to obtain an instruction on the complete statutory definition of voluntary manslaughter. The Court ultimately rejected that position, reasoning as follows:

Simply because unreasonable belief voluntary manslaughter [codified at section 2503(b) ] sometimes may arguably be a lesser-included offense of murder is not a valid reason upon which to base a requirement that a trial judge must instruct a jury on an offense extraneous to the proof at trial. Such requirement only serves to confuse juries and invite them to base their verdicts on whim and caprice. Whatever the merits, or current vitality of the theory that due process requires an instruction on common law voluntary manslaughter in every murder case, we see no reason to extend that theory to require instruction on imperfect self-defense where there is no evidence to support it. Further, invitations to jury confusion or irrationality are unnecessary. Such invitations would be offered here if the jury had been instructed on "unreasonable belief" voluntary manslaughter when the proof at trial did not rationally support a verdict on it.

We hold the "unreasonable belief" manslaughter charge shall be given only when requested, where the offense has been made an issue in the case, and the trial evidence reasonably would support such a verdict. *See Commonwealth v. White,* 490 Pa. 179, 415 A.2d 399 (1980) (involuntary manslaughter); *Commonwealth v. Williams,* 490 Pa. 187, 415 A.2d 403 (1980) (involuntary manslaughter). To the extent that *Commonwealth v. Manning,* [477 Pa. 495, 384 A.2d 1197 (1978) ], indicates otherwise it is overruled. The jury's discretion is better channeled under the rule set forth here to rational deliberation and decision of whether a defendant is guilty of a crime supported by the evidence.

*Id.* at 442–43, 466 A.2d at 1332–33 (footnotes omitted). Applying this rule, the *Carter* Court found that the jury was properly instructed on applicable crimes and that the defendant's testimony characterizing the shooting as an accident tended to establish "an unintentional killing classified by the Crimes Code as involuntary manslaughter." *Id.* at 442, 466 A.2d at 1332.

¶ 21 The Supreme Court addressed a similar issue in *Browdie, supra,* wherein the defendant was convicted of third degree murder based on evidence that he killed a nine-month-old baby by squeezing the child for several minutes, which caused internal hemorrhaging. On appeal, the defendant, who testified at trial that he never physically harmed the child, argued that the trial court erred in refusing to charge the jury on "heat of passion" voluntary manslaughter. Our Supreme Court rejected that claim, observing that there was no evidence to support a finding that the killing was performed in a heat of passion. In so doing, the Court expressly reaffirmed its holding in *Carter* that a trial judge shall not charge the jury on an offense unless the charge has been requested, the offense has been made an issue in the case, and the evidence would support a guilty verdict on that offense. *See Browdie, supra* at 349–50, 671 A.2d at 674.

¶ 22 In the case at bar, it is unclear whether Appellant's counsel requested the standard jury instruction on voluntary manslaughter or whether he sought a modified charge that incorporated the "series of events" doctrine outlined in *McCusker, supra.* The standard instruction states that: (1) when the defendant kills in a heat

of passion following serious provocation, the killing "may be voluntary manslaughter, but never murder;" and (2) the jury can find malice and murder only if it is satisfied that the defendant was not acting "under a sudden and intense passion resulting from serious provocation by the victim." *See* Pennsylvania Suggested Standard Jury Instructions (Criminal) 15.2503A. However, the subcommittee note to that instruction indicates that the charge can be tailored, if necessary, to provide additional explanations of concepts such as passion and provocation. In those instances, the court may also instruct the jury, "The law recognizes that the cumulative impact of a series of related events can lead to sudden passion and amount to serious provocation. The test is whether a reasonable person, confronted with the same series of events, would become so impassioned that he would be incapable of cool reflection." *Id.; see also Commonwealth v. Voytko,* 349 Pa.Super. 320, 503 A.2d 20 (1986).

¶ 23 Herein, the certified record does not contain a list of proposed points for charge, the notes of testimony do not indicate whether Appellant's counsel requested the standard voluntary manslaughter instruction or a *McCusker* instruction, and the trial court opinion is silent on the issue. Thus, we cannot fault the trial court for failing to give a *McCusker* instruction when there is no indication that counsel specifically requested one. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Accordingly, we must confine our review to the issue of whether Appellant was entitled to the standard "heat of passion" voluntary manslaughter instruction.

■ ¶ 24 Upon review, we agree with the trial court's assessment that the evidence would not have supported a verdict of voluntary manslaughter. Voluntary manslaughter contemplates an intentional killing wherein the defendant harbors a specific intent to kill or cause serious injury. *Commonwealth v. Mason,* 474 Pa. 308, 378 A.2d 807 (1977); *see also Commonwealth v. Tolbert,* 448 Pa.Super. 189, 670 A.2d 1172, 1179 (1995) ("Voluntary manslaughter is the intentional killing of another without malice but in a sudden heat of passion brought on by legal provocation."). In the instant case, however, Appellant claimed that he brandished the revolver in an attempt to threaten his brother and that the weapon discharged accidentally. This testimony, if believed, actually would have supported a verdict of involuntary manslaughter. *Accord Carter, supra; see also* 18 Pa.C.S. § 2504(a) (a person is guilty of involuntary manslaughter when he causes death of another person through the commission of an unlawful act in a reckless or grossly negligent manner). Therefore, as Appellant claimed the shooting was accidental, the trial court correctly determined that he was not entitled to a jury instruction on voluntary manslaughter.

¶ 25 Judgment of sentence affirmed.