J-A23005-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON OLIVIERI | : | |
| | : | |
| Appellant | : | No. 2231 EDA 2019 |

Appeal from the Judgment of Sentence Entered July 22, 2019,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0010998-2017.

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON OLIVIERI | : | |
| | : | |
| Appellant | : | No. 2232 EDA 2019 |

Appeal from the Judgment of Sentence Entered July 22, 2019,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0010999-2017.

BEFORE:   KUNSELMAN, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED:  FEBRUARY 22, 2021**

Brandon Olivieri appeals from the judgment of sentence imposed

following his conviction at CP-51-CR-0010999-2017 for first-degree murder

_____

[*] Retired Senior Judge assigned to the Superior Court.

and related offenses, and his conviction at CP-51-CR-0010998-2017 for third-

degree murder.[1]   We affirm.

The trial court set forth the factual history underlying the appeal as

follows:

> From the spring to autumn of 2017, . . . Olivieri, then aged sixteen years old, was a member of a juvenile friend group that included decedent [C.M.], [N.T.], and [J.H.].  This group, which spent their time near their homes at 12th and Tasker Streets in South Philadelphia, often engaged in acts of rivalry with other similarly aged groups located further south, including a group associated with decedent [S.D.].  [S.D.'s] group spent time in the area of 12th and Ritner Streets, approximately one mile south of 12th and Tasker Streets.
>
> Sometime between December 2016 and April 2017, [Olivieri] approached [S.D.] and his friend [E.P.] near the intersection of 12th and Porter Streets in South Philadelphia. During the encounter, [Olivieri] challenged [E.P.] to a fight, and [E.P.] punched [Olivieri], knocking him to the ground.
>
> Over the course of the subsequent months [Olivieri] maintained an Instagram account which he used to participate in a group chat that included the decedent [C.M.], [N.T.], and [J.H.], among others.  [Olivieri] used the group chat application to post messages and photos, including a photo of a silver .45 caliber pistol.  On October 9, 2017, [N.T.] posted a photo to the group chat depicting a piece of feces on the sidewalk stating "Brandon took a shit on opp territory," referring to the area south of Snyder Avenue in South Philadelphia where the decedent [S.D.] was located.   Later that day, [Olivieri] requested that [N.T.] screenshot and send him an image of the decedent [S.D.] and his associates posted on [S.D.]'s Instagram profile.  After [N.T.] did so, [Olivieri] responded that he would "pop all of them."
>
> After school on October 24, 2017, [Olivieri] and [N.T.] met each other at [Olivieri's] house near the intersection of 12th and Tasker Streets.  There, they smoked marijuana and loitered

---

[1] *See* 18 Pa.C.S.A. §§ 2502(a), (c), 6106, 6108, 6110.1, 907.

around before [N.T.] received a phone call from the decedent [C.M.] at approximately 7:00 p.m. During their conversation, [C.M.] indicated that he was looking to fight a group of Hispanic teenagers. [Olivieri] armed himself with the silver .45 caliber pistol that appeared in the previous Instagram photo, and travelled with [N.T.] to meet [C.M.] in the area of 9th and Federal Streets. Failing to find the group in question, [Olivieri], [C.M.], and [N.T.] encountered [J.H.], and the four travelled to the area of 12th and Ritner Streets.

That evening, the decedent [S.D.] and his friends [A.Z.], [J.J.E.], and . . . [N.].D. were spending time together on a corner of the intersection of 12th and Ritner Streets. As [Olivieri] and his cohorts approached their location, [S.D.] recognized the group as "12th Street," while [A.Z.] recognized [C.M.] as a classmate in high school and [Olivieri] as someone he had met months prior. Upon reaching the intersection, [C.M.] told [A.Z.] that the corner was theirs now, and [S.D.] recognized [Olivieri] from the previous fight with [E.P.]. During this encounter, [Olivieri] and [S.D.] briefly spoke to each other, before [Olivieri] drew the .45 caliber pistol from his waistband. Seeing the pistol, [S.D.] lunged at [Olivieri] and attempted to disarm him. During the ensuing struggle, [Olivieri] fired three shots, with one round striking his friend [C.M.] and the final shot striking [S.D.].

During the shooting, [A.Z.] dove behind a car to avoid the gunfire. From there, he made eye contact with [Olivieri], who put the firearm in his waistband before fleeing the scene of the shooting.

Off-duty Philadelphia Police Officer Michael McKowan, who lived on the block where this incident occurred, passed the group while walking his dog . . . immediately prior to the shooting. Upon hearing three gunshots, Officer McKowan turned around and saw [S.D.] running towards him, shouting, "you have to help me," before collapsing on the pavement in front of his own home. McKowan quickly returned to his house to bring his dog inside, and on his way to that location, he spotted [C.M.] lying in front of a home at 1202 Ritner Street. Patrol officers began to arrive at the scene, and [Officer] McKowan assisted Officer Scanlon in placing the unresponsive [C.M.] in the back of a squad car for transport to Jefferson Hospital. Officers Lang and Kolenkiewicz attended to [S.D.] and transported him to the same location.

After arriving at Jefferson [Hospital], [a doctor] pronounced [C.M.] and [S.D.] dead at 9:04 p.m. and 9:13 p.m., respectively.

. . . At trial, Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, testified that . . . for each decedent, the cause of death was a gunshot wound to the chest and the manner of dea[th] was homicide.

In the immediate chaos after the shooting, each of the teenagers scattered either north on 12th Street or east on Ritner Street. Upon hearing the second shot, [N.D.] ran from the area, and dropped his phone halfway down the block . . . before running into a Starbucks and using a phone there to call his stepfather. Both [N.]D. and his stepfather returned to the scene of the shooting, where [N.]D. agreed to speak to the police. [A.Z.] also provided a statement to Detectives on October 24, 2017, but failed to identify [Olivieri] as the shooter.

. . . Upon searching the scene, [Philadelphia police detectives] recovered one projectile, three fired cartridge casings ("FCCs"), and identified cameras located at the nearby Star Mini Market. . . . [Philadelphia police detectives] examined each bullet specimen and FCC and determined that the projectiles were each fired from the same .45 caliber firearm. [Philadelphia police detectives also] recovered video surveillance footage from multiple sources along 12th Street that depicted a group of teenagers running away from the area of the shooting, with [Olivieri] following shortly behind them.

Immediately after the shooting, [N.T.] made more than twenty phone calls in an attempt to contact both [Olivieri] and [C.M.]. Later that evening, during a conversation with friend [M.M.], [N.T.] discovered that [C.M.] had been shot. The next day, [N.T.] visited [Olivieri] at [Olivieri's] home, whereupon [Olivieri] stated that he did not know how he could keep living with himself and that he had no intention to shoot [C.M.]. [Olivieri] later gave the firearm to his friend [R.O.] who, the next day, gave the gun to [M.M.], who hid the gun in a safe under his bed.

On October 26, 2017, [N.T.] accompanied [Olivieri] to their friend [L.G.'s] home, and then the three travelled together to [R.O.'s] grandmother's home in Northeast Philadelphia, where [Olivieri] hoped to hide out for a time. After [N.T.] and [L.G.]

returned to South Philadelphia, [R.O.] met with [M.M.] to dispose of the firearm. They were soon accompanied by [L.G.], who travelled with them to the Delaware River bank off Columbus Avenue, where they tossed the weapon into the river. As [M.M.], [R.O.], and [L.G.] travelled to the river to dispose of the pistol, [M.M.] engaged in a text message conversation with his paramour [A.H.], and during which he updated her on their progress.

Over the course of the investigation, [N.T.], [A.Z.], and [N].D. each provided statements to the police identifying [Olivieri] as a shooter. Though [A.Z.] stated that he did not recognize [Olivieri] during his October 24, 2017 interview, he spoke to members of [S.D.'s] family on October 26, 2017, and decided to provide police with an additional statement. That evening, [A.Z.] returned to the interview room, accompanied by an associate of the [S.D.] family identified as "Chris," where [A.Z.] spoke to detectives. [A.Z.] later saw video surveillance footage of the aftermath of the shooting, and was able to identify [Olivieri] fleeing the area after the shooting.

In the ensuing weeks and months after the homicide, Philadelphia police detectives recovered cell phones from [Olivieri], [N.T.], [L.G.], [M.M.], [A.H.], and each decedent. Detective Lucke, an expert in cell phone data extraction, secured warrants for the devices belonging to [M.M.] and [N.T.], and used data extraction software . . . to extract all of the data from each device, including the contents of the deleted Instagram conversations leading up to the shooting and text messages sent by [M.M.] to [L.G.] and [A.H.] on October 26, 2017.

In the aftermath of the shooting, [N.T.] and [Olivieri] each deleted their Instagram accounts, causing records of their conversations to display the username "Instagrammer" as opposed to their unique identifiers. At trial, [N.T.] identified himself and [Olivieri] as the Instagram users responsible for certain messages in the group chat, and deciphered which message was composed by each individual.

Trial Court Opinion, 9/18/19, at 2-8 (references to the record omitted).

Olivieri was arrested and charged at CP-51-CR-0010998-2017 with

murder (C.M.) and related offenses, and charged at CP-51-CR-0010999-2017

with murder (S.D.) and related offenses. The cases were consolidated and the matter proceeded to trial. In May 2017, a jury convicted Olivieri of third-degree murder (C.M.) at CP-51-CR-0010998-2017, and first-degree murder (S.D.), possession of an instrument of crime ("PIC") and violations of the Uniform Forearms Act ("VUFA") at CP-51-CR-0010999-2017. On July 22, 2019, the trial court sentenced Olivieri to twenty to forty years imprisonment for third-degree murder, a concurrent term of thirty-five years to life imprisonment for first-degree murder, and an aggregate concurrent term of two and one-half to five years and eleven months in prison for the VUFA offenses.[2] Olivieri did not file any post-sentence motions. Olivieri separately filed a timely notice of appeal at each docket.[3] Both Olivieri and the trial court complied with Pa.R.A.P. 1925.

Olivieri raises the following three issues for our review:

1. Did the trial court abuse its discretion when it denied [Olivieri's] motion for a mistrial in light of multiple **Brady**[4] violations with respect to [A.Z.]?

2. Did the trial court abuse its discretion when it admitted irrelevant and unfairly prejudicial Instagram messages that referenced [Olivieri's] prior bad acts?

---

[2] The trial court imposed no additional penalty for PIC.

[3] This Court consolidated the appeals for ease of disposition.

[4] **See Brady v. Maryland**, 373 U.S. 83, 87 (1963) (holding that that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution).

3.  Did the trial court abuse its discretion when it refused to give [Olivieri's] requested voluntary manslaughter instruction with respect to C.M.?

Olivieri's Brief at 2 (footnote added).

In his first issue, Olivieri argues that the trial court abused its discretion by denying his motions for mistrial based on two alleged **Brady** violations. Our standard of review for the denial of a motion for mistrial is as follows:

> [T]he grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

**Commonwealth v. Rega**, 933 A.2d 997, 1016 (Pa. 2007) (citation omitted).

Pursuant to **Brady** and its progeny, the prosecutor has a duty to learn of all evidence that is favorable to the accused which is known by others acting on the government's behalf in the case, including the police. **See Commonwealth v. Weiss**, 81 A.3d 767, 783 (Pa. 2013). The crux of the **Brady** rule is that due process is offended when the prosecution withholds material evidence favorable to the accused. **Commonwealth v. Wholaver**, 177 A.3d 136, 158 (Pa. 2018); **see also** Pa.R.Crim.P. 573(B)(1)(a) (providing that the prosecutor must disclose any evidence within the prosecutor's possession or control that is favorable to the defendant and is material to defendant's guilt or to punishment).

To establish a **Brady** violation, an appellant must prove three elements: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued. **Weiss**, 81 A.3d at 783. In assessing the prejudice prong of a **Brady** claim, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. **Id**. A reasonable probability is a probability sufficient to undermine confidence in the outcome. **Id**. In determining if a reasonable probability of a different outcome has been demonstrated, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. **Id**. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." **Commonwealth v. Chambers**, 807 A.2d 872, 887 (Pa. 2002).

In his first issue, Olivieri argues that the trial court should have granted his motions for mistrial based on two **Brady** violations related to A.Z.'s trial testimony. Olivieri contends that the Commonwealth committed its first **Brady** violation when it failed to disclose the presence of a man named Chris

when A.Z. gave his second statement to police. Olivieri claims that, on October 26, 2017, A.Z. met with S.D.'s family and was thereafter accompanied to police headquarters by S.D.'s father's friend, Chris, who sat in the interview room while A.Z. gave his second statement to police. Olivieri asserts that, regardless of whether the Commonwealth took any further steps to identify Chris, this information should have been passed to the defense. Olivieri argues that, had the defense known that Chris existed, it could have investigated who Chris was and possibly ascertained what influence he had over A.Z.'s decision to proffer his second statement. Olivieri maintains that this information was significant because a prominent theme of the defense was that A.Z.'s second statement was unreliable because he was pressured to give it. Olivieri claims that this theme was substantiated by the fact that "[Olivieri's] house was shot up and the fact that [M.M.] was subsequently beat up by S.D.'s father." Olivieri's Brief at 16.

Olivieri maintains that there is no basis for the trial court's conclusion that information about Chris was not in the Commonwealth's possession. Olivieri contends that "[A.Z.'s trial] testimony distinctly identified who Chris was, Chris' associates, and Chris' hangout." *Id*. Olivieri further asserts that when Chris went to police headquarters with A.Z., Chris would have likely been required to sign-in and interact with detectives. In Olivieri's view, the Commonwealth's knowledge that Chris accompanied A.Z. to police headquarters was new information that the Commonwealth should have

- 9 -

disclosed to the defense, regardless of whether the Commonwealth took steps to determine Chris' identity.

Finally, Olivieri contends that the omission was prejudicial because A.Z. and N.T. were the only witnesses to identify Olivieri as the shooter. According to Olivieri, "[N.T.] is an interested witness who was given use immunity for his statement, and had equal access to the gun and was just as involved in the dispute between the two groups of teens." *Id*. at 17. Olivieri maintains that, had the defense been provided the information about Chris, it could have investigated Chris and further developed its crucial attack on A.Z.'s credibility.

The trial court considered Olivieri's first *Brady* challenge and determined that it lacked merit. The trial court reasoned as follows.

> Olivieri fails to establish that Chris' identity was in the exclusive control of the Commonwealth. During a sidebar discussion, the prosecutor informed this court that investigators were never provided [with] and were unable to ascertain the identity of this particular individual. Accordingly, this court concluded that the Commonwealth did not have sufficient information to make a proper disclosure to the defense. Neither Commonwealth nor defense investigators were capable of revealing Chris' identity before the conclusion of trial. For that reason, [Olivieri] fails to establish that a *Brady* violation occurred, and mistrial was not warranted.

Trial Court Opinion, 9/18/19, at 10-11 (unnecessary capitalization omitted).

Mindful of our standard of review, we cannot conclude that the trial court abused its discretion in denying Olivieri's request for a mistrial. Olivieri did not establish that Chris' identity was suppressed by the prosecution, either willfully or inadvertently, as the Commonwealth did not know Chris' identity

and was not able to ascertain it prior to the conclusion of trial. *See* Trial Court Opinion, 9/18/19, at 11.

Further, Olivieri did not establish that Chris' presence at the time A.Z. gave his second statement is favorable to Olivieri either because it is exculpatory or because it impeaches A.Z.'s credibility. The mere fact that Chris was friends with S.D.'s father is insufficient to meet this burden, particularly where the defense was aware that A.Z. met with S.D.'s family prior to giving his second statement.

Finally, Olivieri has not demonstrated a reasonable probability that, had Chris' presence in the interview room been disclosed to the defense prior to trial, the result of the proceeding would have been different. Here, although the defense was not aware of Chris' presence in the interview room until trial, the defense nevertheless developed an argument at trial that A.Z. was unduly influenced by Chris. Olivieri concedes that A.Z.'s trial testimony "distinctly identified who Chris was, Chris' associates, and Chris' hangout." Olivieri's Brief at 16. Based on this information, defense counsel crossed-examined A.Z. regarding his motives for giving a second statement to police. *See* N.T. Trial, 5/14/19, 261-68. Defense counsel also elicited testimony from A.Z. which clarified that Chris, rather than A.Z.'s mother or another family member, accompanied A.Z. to police headquarters and was present in the same room when A.Z. gave a statement identifying Olivieri as the shooter. *Id*.

- 11 -

Moreover, as we explained above, the mere possibility that an item of undisclosed information **might** have helped the defense, or **might** have affected the outcome of the trial, does not establish materiality in the constitutional sense. **Chambers**, 807 A.2d at 887. Instead, Olivieri was required to establish a probability sufficient to undermine confidence in the outcome of the proceedings. **See Weiss**, 81 A.3d at 783. Based on the record before us, Olivieri has not met this burden. As Olivieri failed to satisfy this requirement, we discern no abuse of discretion by the trial court in denying Olivieri's request for a mistrial. Accordingly, Olivieri's first **Brady** challenge merits no relief.

In his second **Brady** challenge, Olivieri contends that the trial court abused its discretion in denying his request for a mistrial when A.Z. testified that he disclosed to prosecutors prior to trial that he made eye contact with the shooter (Olivieri) when A.Z. sought cover behind a vehicle after the shooting. Olivieri asserts that this information was not included in either of A.Z.'s statements to law enforcement which were provided to the defense in discovery.

Olivieri maintains that this evidence was relevant to A.Z.'s credibility. According to Olivieri, A.Z. indicated that he was fifteen feet away from S.D. when Olivieri, who had his hood up, allegedly approached S.D.; however, A.Z. was also simultaneously confronted by C.M. and two hooded individuals when Olivieri and S.D. were allegedly speaking. Olivieri argues that "[A.Z.'s]

description of where people were located that night make his ability to observe and identify [Olivieri] in the fifteen . . . seconds he was speaking to C.M. before the struggle over the gun ensued and when [A.Z.] ducked behind a car dubious, at best." Olivieri's Brief at 19.

Olivieri contends that the chronology and evolution of A.Z.'s statements are probative of the defense theory that he was pressured into identifying Olivieri as the shooter. Olivieri claims that, by failing to disclose A.Z.'s meeting with S.D.'s family, Chris escorting A.Z. to police headquarters and supervising his second statement, and A.Z. supposedly making eye contact with Olivieri, the Commonwealth handicapped his ability to support his defense, and in so doing deprived him of a fair trial.

The trial court considered Olivieri's second ***Brady*** challenge and determined that it merited no relief. The trial court explained its reasoning as follows:

> At trial, [A.Z.] testified that he was able to identify [Olivieri] via video surveillance, previous encounters with [Olivieri], and in part because he made eye contact with him while taking cover during the shooting. Such evidence is not exculpatory, as [A.Z.'s] recollection of making eye contact with [Olivieri] serves to [amplify] the basis of his identification.
>
> [Olivieri] further fails to demonstrate prejudice. Upon hearing [A.Z.'s] testimony, trial counsel had an ample opportunity to cross-examine him on his motives for excluding such a detail in prior statements, and he elected to engage in such a line of questioning at significant length. Any effect this detail may have had on [A.Z.'s] credibility is extremely limited, as the existence of two police statements already established that [A.Z.] elected to withhold details from investigators at different points during the investigation. Further, the challenged testimony is not

- 13 -

inconsistent with either [A.Z.'s] October 24 or October 26, 2017 statements. In each statement, [A.Z.] informed police that he was present at the shooting and was able to look at the shooter, which he identified as [Olivieri] in the October 26, 2017 statement. Any discrepancy between the manner of which he looked at [Olivieri], in this case by making eye contact, is too inconsequential to carry significant impeachment value. Accordingly, the instant ***Brady*** claim fails.

Trial Court Opinion, 9/18/19, at 9-10 (citations to the record omitted).

Applying the same standard of review as we employed above, we cannot conclude that the trial court abused its discretion in arriving at its determination that Olivieri failed to meet his burden of establishing a second ***Brady*** violation so as to warrant a mistrial. The fact that A.Z. made eye contact with Olivieri after the shooting is not favorable to Olivieri. Such evidence is certainly not exculpatory in nature. Further, such evidence does not impeach A.Z.'s credibility because he had previously identified Olivieri as the shooter. For the same reason, Olivieri has not demonstrated a reasonable probability that, had such eye contact been disclosed to the defense prior to trial, the result of the proceeding would have been different. Accordingly, as Olivieri failed to establish his second ***Brady*** violation, we discern no abuse of discretion by the trial court in denying his additional request for a mistrial. For this reason, Olivieri's second ***Brady*** challenge merits no relief.

In his second issue, Olivieri contends that the trial court abused its discretion when it admitted an Instagram post into evidence. Our standard of review concerning the admissibility of evidence at trial is well-settled:

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015).

Under our Rules of Evidence, "[r]elevance is the threshold for admissibility of evidence." *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015); *see also* Pa.R.E. 402. "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401; *see also Tyson*, 119 A.3d at 358 (stating that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact."). "Evidence that is not relevant is not admissible." Pa.R.E. 402. In addition, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Pa.R.E. 404(b) prohibits the admission of prior crimes, wrongs, or acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1).

- 15 -

However, such evidence may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2); **see also Commonwealth v. Drumheller**, 808 A.2d 893, 905 (Pa. 2002) (holding that courts will allow evidence of prior bad acts where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the case and was part of its natural development). In a criminal case, this type of evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice. Pa.R.E. 404(b)(2).

Here, the Instagram post in question is one that N.T. posted to the group chat on Instagram, and depicts an image of feces in cat litter with the caption "Brandon took a shit on opp territory." Olivieri's Brief at 21. Olivieri challenges the trial court's evidentiary ruling that the post was relevant to show Olivieri's motive and to depict a chain of events leading up to the shooting. According to Olivieri, there was no evidence of an on-going dispute between the groups of teens. Olivieri points out that, although his friends N.T. and M.M. alleged there was a fight between Olivieri and S.D. or his friend, sometime earlier in 2017 or late 2016, N.T. and M.M. did not testify regarding any other incidents. Olivieri additionally points out that, although A.Z. hung out with S.D. every day, A.Z. did not know who Olivieri was until a month or two prior to the shooting and did not recall any prior relationship between Olivieri and S.D. Olivieri also notes that S.D.'s other friends, E.P. and M.M.,

- 16 -

only recounted one encounter between Olivieri and S.D. and his friends. Olivieri contends that, under the circumstances, the challenged Instagram post should have been precluded as irrelevant, prejudicial, confusing, and inadmissible character evidence.

The trial court considered Olivieri's second issue and determined that it lacked merit. The trial court reasoned as follows:

> At trial, the Commonwealth presented ample evidence to demonstrate that [Olivieri] and his cohorts were involved in a series of disputes with small teenage groups located south of Snyder Avenue in Philadelphia. While the photo in question may appear to depict a mere act of juvenile antagonism, in the context of the Instagram conversation as a whole, the evidence is relevant to demonstrate how [Olivieri] formed a desire to shoot and kill [S.D.] [as] early as two weeks prior to the shooting. During the same conversation thread later that day, [Olivieri] commented on a photo of [S.D.] by stating that he would "pop all of them," indicating [S.D.] and his associates. In this context, the evidence is relevant to explain how [Olivieri's] actions prior to the shooting, including defecation near [S.D.]'s home, reflect [Olivieri's] motive to shoot and kill [S.D.] and his associates.

Trial Court Opinion, 9/18/19, at 11-12 (citations to the record omitted).

We discern no abuse of discretion by the trial court in reaching its evidentiary ruling. At trial, the Commonwealth presented ample evidence of verbal and physical conflicts between Olivieri and S.D. in the months preceding the shooting. Olivieri approached S.D. and his friend, E.P., and challenged E.P. to a fight. In that encounter, E.P. punched Olivieri, knocking him to the ground. Over the course of the subsequent months Olivieri used a group Instagram chat to post a photo of a silver .45 caliber pistol. Thereafter, Olivieri's friend, N.T., posted the subject photo to the group Instagram chat

- 17 -

depicting the piece of feces on the sidewalk with the caption stating "Brandon took a shit on opp territory," which referred to the area in South Philadelphia where S.D. was located. Olivieri then requested that N.T. send him an image of S.D. and his friends from S.D.'s Instagram profile and, after N.T. did so, Olivieri responded that he would "pop all of them." Given this factual sequence, the subject Instagram post was clearly part of a chain or sequence of events which formed the history of the case and was part of its natural development. *See Drumheller*, 808 A.2d at 905. Olivieri has not demonstrated that the probative value of the subject post outweighs its potential for unfair prejudice. *See* Pa.R.E. 404(b)(2). Nor has he demonstrated that, in making its ruling, the trial court overrode or misapplied the law, or that its ruling is manifestly unreasonable or the result of partiality, prejudice, bias or ill-will. *See Woodard*, 129 A.3d at 494. Accordingly, Olivieri's second issue warrants no relief.

In his final issue, Olivieri avers that the trial court abused its discretion when it denied his request for a voluntary manslaughter instruction with respect to C.M. In reviewing a challenge to the trial court's refusal to give a specific jury instruction, we employ the following standard of review:

> [I]t is the function of this [C]ourt to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A

charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Brown*, 911 A.2d 576, 582-83 (Pa. Super. 2006) (quotation marks omitted).

Generally, defendants are entitled to instructions that they have requested and that are supported by the evidence. *See Commonwealth v. Hairston*, 84 A.3d 657, 668 (Pa. 2014). However, "[i]nstructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury." *Commonwealth v. Patton*, 936 A.2d 1170, 1176 (Pa. Super. 2007). Thus, "[a] trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict." *Commonwealth v. Browdie*, 671 A.2d 668, 673-74 (Pa. 1996). The reason for this rule is that instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict. *See Hairston*, 84 A.3d at 668. A criminal defendant must, therefore, "establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented

during trial." ***Commonwealth v. Carter***, 466 A.2d 1328, 1332-33 (Pa. 1983).

In determining whether the evidence would support a manslaughter charge, we must view the evidence in the light most favorable to the defendant." ***Commonwealth v. Soltis***, 687 A.2d 1139, 1141 (Pa. Super. 1996). Pursuant to 18 Pa.C.S.A. § 2503, a person commits voluntary manslaughter if he kills another while, *inter alia*, "acting under a sudden and intense passion resulting from serious provocation by: (1) the individual killed; or (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed." 18 Pa.C.S.A. § 2503(a). Thus, voluntary manslaughter contemplates an intentional killing wherein the defendant harbors a specific intent to kill or cause serious injury. ***See Commonwealth v. Patton***, 936 A.2d 1170, 1179 (Pa. Super. 2008).

Olivieri asserts that the trial court found that the facts of the case precluded a voluntary manslaughter instruction because Olivieri was not acting under intense passion or specific intent when C.M. was shot. Olivieri contends that the jury could have found him guilty of voluntary manslaughter with respect to C.M. under the transferred intent doctrine because the evidence at trial reflected that when Olivieri allegedly pulled his gun out, S.D. charged at him and a struggle ensued. Based on this evidence, Olivieri argues that the jury could have found that he was acting under a theory of imperfect self-defense or heat of passion when the shot went off during his struggle with

S.D. and hit C.M.  Olivieri points out that the jury was charged on voluntary manslaughter with respect to S.D., and on transferred intent.  Olivieri claims that a verdict of voluntary manslaughter was possible even with the jury's finding of first-degree murder with respect to S.D. based on Olivieri's alleged confessions to his friends.

The trial court addressed Olivier's final issue and determined that it lacked merit.  The trial court reasoned as follows:

> The facts of the instant case preclude the verdict of voluntary manslaughter with respect to decedent [C.M.] and no instruction was warranted.  The evidence presented at trial demonstrated that after Olivieri drew a pistol, a struggle for the weapon between Olivieri and [S.D.] resulted in the weapon's discharge, causing a projectile to strike and kill the decedent [C.M.].  Based on these facts, Olivieri was acting neither with the intent to kill [C.M.] or under the heat of an intense passion at the time the shot was fired.

> Olivieri contends that, because the jury was instructed on voluntary manslaughter for the death of decedent [S.D.], Olivieri was entitled to the same instruction with respect to [C.M.].  This contention is unsupported.  The evidence shows that Olivieri shot and killed [S.D.] only after the unintentional shooting of [C.M.] occurred.  Given these circumstances, a reasonable juror could conclude that [C.M.'s] death enflamed [B.O.'s] passion, causing him to kill [S.D.].  No similar confluence of circumstances existed prior to [C.M.'s] shooting: the evidence suggested that that Olivieri drew his weapon upon [S.D.] without provocation, before Olivieri inadvertently fired his weapon and killed [C.M.] during the subsequent struggle.  Accordingly, the record does not support any basis to justify a voluntary manslaughter instruction,

Trial Court Opinion, 9/18/19, at 14-15 (footnote and unnecessary capitalization omitted).

The trial court further explained:

> For the decedent [C.M.], this court instructed the jury on first-degree murder, third-degree murder, and involuntary manslaughter. Though this court notes that voluntary manslaughter cannot be proven absent a finding of the defendant's intent to kill, a jury could have convicted Olivieri [of] first-degree murder [of C.M.] under the doctrine of transferred intent [to kill S.D.] Olivieri's intent to kill [S.D.] does not, on its own, warrant a manslaughter charge [as to C.M.], for want of the missing passion element.

*Id*. at 15 n.3. (unnecessary capitalization omitted).

We discern no abuse of discretion or error of law by the trial court in declining to instruct the jury on voluntary manslaughter as to C.M. Viewing the evidence in the light most favorable to Olivieri, such evidence does not warrant a voluntary manslaughter instruction under 18 Pa.C.S.A. § 2503(a). Olivieri did not establish that a "serious provocation" by either C.M. or S.D. resulting in a "sudden and intense passion" precipitated the inadvertent shooting of C.M., as is required under § 2503(a). Thus, as Olivieri failed to establish that the evidence would reasonably support a verdict based on voluntary manslaughter as to C.M., he may not claim entitlement to an instruction on that crime. *Carter*, 466 A.2d at 1332-33. For this reason, his final issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>2/22/21</u>